TO THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

Radcliffe Bancroft Lewis, Pro Se

*Plaintiff*

vs.

07-697 rjl

The District of Columbia Judiciary, Et al

*Defendant*

---

**SECOND RESPONSE TO THE DISTRICT OF COLUMBIA'S MOTION TO DISMISS**

**and**

**NOTICE OF THE PENDANCY OF FURTHER FILINGS AND MOTIONS**

NOTICE *FRCP 6(b)(2), 7(2) and (c) Duress*

**Will the Court please note the pendancy of continuation of filing for the following reason:**

**In attempting to complete his claims as requested and granted, the plaintiff on this 24th day of April, 2008 was again disbarred by a publicly available word processing center. Thus eight hours available to the task of tabulation has been limited to two, and at 2120 hours the plaintiff is simply not able to complete the comprehensive and frameablel demands for relief in a space of ten minutes, he having lost not less than six hours due to the unforseen disbarment. Time does not permit the formating of this notice into even a proper motion.**

**Please note the review below.**

*Signi*

# REVIEW

## Parallel Actions

As indicated in his first response and motion for enlargement, and other pleadings, Plaintiff filed suit against various parties in the District of Coulumbia for wrongful termination of his contract or agreement (or 'by whatsoever name called...') engagement of understanding with the District because that termination an the manner in which it was carried out resulted in a devastatiuon of his income and his public perception before others (how he is percieved by others in public). In commencing action against the disparate act, Plaintiff sought a formal administrative hearing but was denied any formal administrative form of redress. Plaintiff nevertheless made use of an informal process by which he could address the Chief Judge of the D.C. Superior Court, Rufus King with his complaint, and thereby made King aware of the limitations hindering the Plaintiff's ability to merely acquiesce to Wells's demand (pursuant to the Smith Act of 1940, (18 U.S.C. § 2385)), that Lewis register with the Department of Motor Vehicles to obtain a drivers license, and then show that to Wells. Nevertheless King rufused to reconsider the unexplained decision against Lewis, and still refused him a formal venue where he could appeal the unwarranted decision.

In parallel Lewis also filed suit against the United States Department of Veterans Affairs alleging that that Department defamed him, a revelation that came to him through his questions regarding the operations of the Department and subsequent discovery of one of its executive edicts "Ending Chronic Homelessness" **(note Exhibit 1, first page of edict available at http://aspe.hhs.gov/hsp/homelessness/strategies03/),**



hereto hence the "ECH" as well as subsequent treatment by one "Youngblood" located at 1722 I Street, NW, and employment service center for veterans. The Department refused to consider either its published policy or the actions of Youngblood. **Note Exhibit 2 (Request of reconsideration to the Department).**

### Convergence of Actions

These parallel actions on the part of the agents of the District of Columbia and the United States converge in that they were notified by the plaintiff that the justification for their demands or profiling encroach upon each other's statory laws and the manner in which they conduct the business of government.

Rufus King was made aware that his demands could place Lewis at risk of violating the Smith act of 1940, and that Brenden Wells's assertion that he does not know what a veterans affairs ID Card is did not comport with his position as Deputy Investigator of the Public Defender Service, and the agent most perceptively responsible for assuring that the candidates for CJA Certification pass a National Crimes Information Center (NCIC) background check.

Moreover, Wells and the Public Defender Service was granted by Lewis full authority to engage any fact finding through third parties in order to conduct any background information.

Ann Wicks was also made aware of Lewis's federal related concerns and at any time as the Executive Officer of the Judiciary of the District of Columbia could intervene and address his compliant particularly by granting a formal hearing on the matter where

Lewis could state his case and explain the effects to the actions of the judiciary relative to other operations in the Destrict of Columbia and the United States.

Lewis Wallace on more than one occasion indicated that he "designed" the finance process for payments to CJA attorneys and investigators, but with the District, particularly King and Wicks asserting that "there was never any intentionn on the Courts' part to establish an employee or contractor relationship between the CJA Type Investigators and the Courts (Document 17-2" page 7 lines 14 to 15) the "designer" of the system is not absolved from the demand to follow through and matriculate Lewis as a Certified CJA Investigator.

The DC Public Defender Service (PDS) for its part, of which Julia Lieghton serves in two or more positions, assert that it is involved in this operation  as an agent of the Court. But Leighton also sits on committees within the District of Columbia Court as well -- committees that directly oversee what the PDS does for the D.C Superior Court, even though PDS is and independent agency of the District of Columbia.

 Even if Leighton now asserts that her postions on court committees are independent of her activities within and about PDS, the PDS is still an agency of the courts, and she oversees PDS in that regard, something the plaintiff recently found out.

As an independent agency the Congress of the United States and not the municipality of the District of Columbia is the soveriegn head of the DC Public Defender Service, or, in the alternative, the Public Defender Service answers to no other in its conduct.  As Wells is the face of PDS through which Lewis interacted with the PDS, if the courts are

unwilling to correct Wells, the PDS also liable for its conduct - the disparate treatment against Lewis.

Both the Government of the District of Columbia and the Department of Veterans Affairs obtained formal notice of the complaint against Youngblood.  Veterans Affaris refused to address the conduct of Youngblood asserting that the One Stop Center at 1722 I Street is an agency of the D.C. Department of Employment Services (DOES).  To date, having been made aware of the detrimental effects of the ECH, that it profiles Lewis as "not credible" or "suspicions" when seeking employment or contract with others.  the DOES has not responded.

That the United States and Department of Veterans Affairs Are Inextricabley Linked

As late as to today (24 April 2008), upon learning the Lewis was working on this case, as visited the One Stop Center at 1722 I Street to do so ( it being the material issues herein this case address 'barriers to employment' of Lewis, the staff of the One Stop Center again barred Lewis from the premises asserting that he is not allowed to work on this matter there.  This time before the security officers escorted him out of the building, Lewis was able to acquire the ear of a staff member of the Department of Veterans Affairs Regional Counsel right next door to the One Stop Center and to obtain some indication in writing to evidence he was being barred as the staff in the One Stop Center refused to give anything in writing: not the notice of bar, not the authorizing law, policy, directive, or reference thereto, and not any other official to whom Lewis may obtain such information.  The staff member of the VA Regional Counsel insists that that Regional Counsel Office does not represent the One Stop Center because it is a part of the District of Columbia Employment Service; and in fact the name of the individual



obtained by the Regional Staff Member who Lewis should direct inquiries to turns out to be one:

**"Tommy Abner, Veterans Coordinator, 609 H Street, N.E. Room 502, Washington, D.C. 20005".**

However the door seal of the One Stop Center indicates the proper name of the One Stop Center to read:

**"The US Department of Veterans Affairs Regional Office Employment Service Center".**

Moreover this Center as full and unabridged access to the personnel files of any veteran who goes there including their names, Social Security and so forth. Additionally whatever they don't have, because they tend to the affairs of veterans of the United States Armed Forces, such veterans have no indication that whatever additional information they pass to that staff in that office they are passing to a separate sovereignty, the District of Columbia, not the United States. There are therefore several areas where we see indistinguishions betweent the federal defendants and the District:

In the symbiotic relationship between the District of Columbia Judiciary and the Chief Judges where the judiciary is expected to be a part of the municipality of the District of Columbia but the Chief Judges are federal agents holding higher rank than the most senior member of the non-judicial side of the judiciary, Ann Wicks, who is compensated at the rate of an associate judge;

In the symbiotic relationship regarding the structure of the jury instructions relying on the DC Code as earlier explained;

In the amorphous relationship of the PDS being an "independent agency",

In the information, office building, and services offered sharing betweent the U.S. Department of Veterans Affairs, which is a United States Federal Department and the US Department of Veterans Affairs Regional Office of Employment Services, which is a District municipal sub-agency.

These several symbiotic relationship are too close to sever one set of defendants from the other without comprehending the full scope of claims necessary for the plaintiff to assert at this time if the defedants rely on the Twombly standard of responding to and F.R.C.P. 12 b (1)/(6) motion as opposed to the standard available to pros se litigants in keeping with the rulings on Erickson.

There is one other symbiotic relationship that completes the picture here.  Noting both the ECH and a letter presented to Youngblood in response to his own inquiry as to why Lewis needs to use his US named DC sub-agency office to address "barriers to employment" See Exhibit 3, 15 SEP 2006 Letter to Youngblood, we see that D.C. App. Rule 49, DC Code 47-2839 bars any non-attorney not just from practicing law, but from engaging in any information related business practice in the District of Columbia.  Plaintiff provides here an comprehensive talking points draft regarding his analysis of the effect of thes rules on his subsequent employability, which was prepared to answer yet the inquiries of yet another One Stop office in the District, this one focusing on entrepreneurship. See Exhibit 5. Coupled with the ECH which holds

# Ending Chronic Homelessness:
# Strategies for Action

## U.S. Department of Health and Human Services
Tommy G. Thompson, Secretary



Report from
the Secretary's Work Group
on Ending Chronic Homelessness

March 2003

*This report is available on the Internet at:*
http://aspe.hhs.gov/hsp/homelessness/strategies03/

How to Obtain a Printed Copy

# Contents

Executive Summary

Acknowledgments

Chapters:

1.  The Approach
2.  Defining Chronic Homelessness and Understanding Treatment and Support Needs
3.  How HHS Mainstream Service Programs Align With the Treatments and Services That Address Chronic Homelessness
4.  How The Plan Was Developed
5.  A Formal Statement of the HHS Comprehensive Plan to End Chronic Homelessness

Appendices:

A.  Membership of the Secretary's Work Group on Ending Chronic Homelessness
B.  Membership of the Interagency Subcommittee of the Secretary's Work Group
C.  Definitions of Treatments and Services for People Who Experience Chronic Homelessness
D.  Citations for Research/Evaluation Findings on Effective Treatments and Services for People Who Experience Chronic Homelessness

*Exhibit 1*

# Acknowledgments

The Work Group recognizes the contributions of presenters at the July, 2002 Listening Session including: Virginia Harmon, Deputy Director for Quality Management, Department of Community Health, Michigan; Charles Kieffer, Coordinator, Homeless Programs, State Housing Development Authority, Michigan; Robert Hess, Deputy Managing Director for Special Needs Housing, City of Philadelphia; DiAnn Koehl, Executive Director, Midland Fair Haven, Midland Texas; Heidi Nelson, Executive Director, Chicago Health Outreach; Ralph Forquera, Executive Director, Seattle Indian Health Board; and Philip Mangano, Executive Director, Interagency Council on Homelessness.

Work Group members are grateful to the staff and clients of Unity Health Care Inc., Washington, DC. Mr. Jose Aponte generously arranged two visits for the Subcommittee and the presentations about their work with homeless persons were most informative.

# How to Obtain a Printed Copy of this Report

To print a copy of this report in a "printer friendly" version (PDF format), print the following files in the order below:

- Cover Page
- Table of Contents
- Executive Summary
- Chapter 1
- Chapter 2
- Chapter 3
- Chapter 4
- Chapter 5
- Appendix A
- Appendix B
- Appendix C
- Appendix D

# Where to?

Top of Page | Contents

Home Pages:
Human Services Policy (HSP)
Assistant Secretary for Planning and Evaluation (ASPE)
U.S. Department of Health and Human Services (HHS)

Last updated:  07/01/04

Radcliffe B. Lewis
P.O. Box 2241, Washington, DC 20013-2241

Tel: 202 664-3130                                        Email: rad_bancroft@hotmail.com

17 NOV 2006

To:    The U.S. Department of Veterans Affairs
       Office of Regional Counsel
       1722 I Street, NW, Suite 302
       Washington, DC 20421

Re:    Tort Claim

Dear Department:

I have been in receipt of your 27 September 2006 "final denial" response to the Claim that I submitted to you regarding the activities of one Henry Youngblood a the "One Stop Center" housed inside the third floor 1722 I Street, NW, Washington, DC.

A. Acknowledgments
The following are noted:
1. That you indicate finding "no such negligent or wrongful acts or omissions in this case". – to which I demure.
2. That you deny that any individual under your employ were involved in the incidents regarding my claim. – to which I demure.
3. That I may respond if I am dissatisfied my emailing a request for reconsideration to OCG.torts@mail.va.gov within six months of the date of your final denial, after which VA may have an additional six months from the date of such request "to make a final disposition of the claim", and that my "option to file suit shall not accrue until six months after the filing of such request for reconsideration" – and you specified the codification of the law.
5. That in the alternative I may file suit within six months after the date of mailing of your "final denial" – and you specified a different set of laws.
6. That you close your letter by indicating that at the time of suit in exercise of option number 5 above, the proper defendant is the United States, no VA.

In the event that I have interpreted the gist of your response incorrectly, please notify me promptly.

B. Observation
1. We know that the Department of Veterans Affairs is a Cabinet Level of the Executive Branch of the Government of the United States. We know that the Department of Employment Services (DOES) is an Executive Agency of the Governments of the District of Columbia.
We know that for legal reasons the Governments of the District of Columbia is considered a separate municipal authority from the various Departments of the Governments of the United States.
2. You now assert the facilities in question are owned by the DOES and the Youngblood is an employee of that entity.

3. We also know that the facilities in question are reserved exclusively for veterans of the United States Armed Forces (Federal Veterans) and not veterans of the governments or municipality of the District of Columbia.

4. We also know that the entire building at 1722 I (Eye) Street NW, Washington, DC houses the various regional offices of the Department of Veterans Affairs and that, at least where average members of the public are aware, that Department is in complete control of all access to the building both with respect to individual use and general purpose for access granted.

5. Finally, in keeping with Attachment I of the claim filed you may have noted that the claim raises issues regarding:

a. The denial of benefits or access to business-minded veterans, as opposed to those who accept "standard "w-2" type employment", (see that Attachment 1, D, page 5);

b. Misrepresentations made regarding the Montgomery General Infantry Bill, (see that Attachment 1 E, page 5);

c. The assertion that you discriminate against veterans who are not classified as disabled, (see that Attachment 1 E, page 5):

d. The timing of the actions respective to a previous suit filed against you; and

e. Significant questions regarding the policy of the Department of Veterans Affairs as to how you perceive your subjects-veterans of the Armed Forces of the United States.

f. Finally it has been almost two months of the Governments of the District of Columbia has not responded.

C. Analysis

In effect then the 'problem' with Youngblood and the DOES merely points to a bigger problem; a cesspool of disparate treatment based upon the way that the Department of Veterans Affairs handles its business particularly against minority disadvantaged veterans who may find it necessary to utilize some of the benefits that they thought they acquired access to through contracting with the Armed Forces of the United States, provided they are able to complete one round of active duty, or eight years contracting obligation of service – and live. Given that there are well placed bureaucrats within the Government of the District of Columbia and security guards who in being shown a veterans identification card, or other federal entity generated picture identification such as a Library of Congress identification card, may deny a member of the public access to such parts as the building housing the seat of government of the District of Columbia Government, and may even have the audacity to declare "I do not know what that is!", it is incredulous to believe the Governments of the District of Columbia would reserve an entire DOES One Stop Center, fully outfitted with internet accessible terminals, printers, telephones, and facsimile services, all for free, to federal veterans only, out of the goodness of their heart. It becomes ludicrously incredulous when upon such a sizeable gift now housed inside one of your huge facilities to ease your consideration of federal veterans, one of their employees would then complain about *paper*.

Perhaps then you should reconsider your findings and the direction of your focus so as to include the bigger picture and the greater scheme of things, and properly investigate the facts.

But in the event that you do not regard the incredulous issues so far discovered as a result of this claim and the end result so far, that I find it pertinent to renounce the validity of the credentialing institutions governed by one of your sister departments, perhaps a simple test is in order, (for

after all, who are you to know about such minutiae as "Paul" and "Michael". Here are just a few questions that I am sure you can ask yourselves:

1. Does the Department of Veterans Affairs hold any policy against economically deprived minority veterans so as to hold them in derisions?
2. Does the Department of Veterans Affairs consider in any way, as a matter of policy, or otherwise, that just because a minority adult is also single and significantly indigent, (sufficient to be in need of use of a One Stop Center), he or she may in any way be classified by you as "disconnected" or, as "heavy users of services"?
3. Could all those benefits and preferences given to disabled veterans but withheld from veterans who may be minority and indigent but who are not otherwise classified by you as disabled veterans constitute a significant level of disparate treatment against disadvantaged veterans?

Now just on these three questions alone without consideration of anything else, in the event that you perceive that maybe, just maybe, the answer to any one of them could be "Yes", perhaps you should reconsider this claim. Instead of going directly to suit then, I offer you this opportunity to reconsider it, and please bear in mind that there is a matter of equity coming to bear here on my individual needs, as it is not appropriate for the continual adjustment of your policies to assuage the disparities on behalf of others, while I, who have to move at you through the FTCA process must remain indigent, and also barred.

Sincerely,

Radcliffe Bancroft Lewis, Claimant

Radcliffe B. Lewis
P.O. Box 2241, Washington, DC  20013-2241

Tel: 202 664-3130 _____ Email: rad_bancroft@hotmail.com

17 NOV 2006

To:     The U.S. Department of Veterans Affairs
        Office of Regional Counsel
        1722 I Street, NW, Suite 302
        Washington, DC  20421

Re:     Tort Claim

Dear Department:

I have been in receipt of your 27 September 2006 "final denial" response to the Claim that I submitted to you regarding the activities of one Henry Youngblood a the "One Stop Center" housed inside the third floor 1722 I Street, NW, Washington, DC.

A. Acknowledgments
The following are noted:
1. That you indicate finding "no such negligent or wrongful acts or omissions in this case". – to which I demure.
2. That you deny that any individual under your employ were involved in the incidents regarding my claim. – to which I demure.
3. That I may respond if I am dissatisfied my emailing a request for reconsideration to OCG.torts@mail.va.gov within six months of the date of your final denial, after which VA may have an additional six months from the date of such request "to make a final disposition of the claim", and that my "option to file suit shall not accrue until six months after the filing of such request for reconsideration" – and you specified the codification of the law.
5. That in the alternative I may file suit within six months after the date of mailing of your "final denial" – and you specified a different set of laws.
6. That you close your letter by indicating that at the time of suit in exercise of option number 5 above, the proper defendant is the United States, no VA.

In the event that I have interpreted the gist of your response incorrectly, please notify me promptly.

B. Observation
1. We know that the Department of Veterans Affairs is a Cabinet Level of the Executive Branch of the Government of the United States.  We know that the Department of Employment Services (DOES) is an Executive Agency of the Governments of the District of Columbia.
We know that for legal reasons the Governments of the District of Columbia is considered a separate municipal authority from the various Departments of the Governments of the United States.
2. You now assert the facilities in question are owned by the DOES and the Youngblood is an employee of that entity.

3. We also know that the facilities in question are reserved exclusively for veterans of the United States Armed Forces (Federal Veterans) and not veterans of the governments or municipality of the District of Columbia.

4. We also know that the entire building at 1722 I (Eye) Street NW, Washington, DC houses the various regional offices of the Department of Veterans Affairs, and that, at least where average members of the public are aware, that Department is in complete control of all access to the building both with respect to individual use and general purpose for access granted.

5. Finally, in keeping with Attachment I of the claim filed you may have noted that the claim raises issues regarding:

a. The denial of benefits or access to business-minded veterans, as opposed to those who accept "standard "w-2" type employment", (see that Attachment 1, D, page 5);

b. Misrepresentations made regarding the Montgomery General Infantry Bill, (see that Attachment 1 E, page 5);

c. The assertion that you discriminate against veterans who are not classified as disabled, (see that Attachment 1 E, page 5):

d. The timing of the actions respective to a previous suit filed against you; and

e. Significant questions regarding the policy of the Department of Veterans Affairs as to how you perceive your subjects-veterans of the Armed Forces of the United States.

f. Finally it has been almost two months of the Governments of the District of Columbia has not responded.

C. Analysis

In effect then the 'problem' with Youngblood and the DOES merely points to a bigger problem; a cesspool of disparate treatment based upon the way that the Department of Veterans Affairs handles its business particularly against minority disadvantaged veterans who may find it necessary to utilize some of the benefits that they thought they acquired access to through contracting with the Armed Forces of the United States, provided they are able to complete one round of active duty, or eight years contracting obligation of service – and live. Given that there are well placed bureaucrats within the Government of the District of Columbia and security guards who in being shown a veterans identification card, or other federal entity generated picture identification such as a Library of Congress identification card, may deny a member of the public access to such parts as the building housing the seat of government of the District of Columbia Government, and may even have the audacity to declare "I do not know what that is!", it is incredulous to believe the Governments of the District of Columbia would reserve an entire DOES One Stop Center, fully outfitted with internet accessible terminals, printers, telephones, and facsimile services, all for free, to federal veterans only, out of the goodness of their heart. It becomes ludicrously incredulous when upon such a sizeable gift now housed inside one of your huge facilities to ease your consideration of federal veterans, one of their employees would then complain about *paper*.

Perhaps then you should reconsider your findings and the direction of your focus so as to include the bigger picture and the greater scheme of things, and properly investigate the facts.

But in the event that you do not regard the incredulous issues so far discovered as a result of this claim and the end result so far, that I find it pertinent to renounce the validity of the credentialing institutions governed by one of your sister departments, perhaps a simple test is in order, (for

after all, who are you to know about such minutiae as "Paul" and "Michael". Here are just a few questions that I am sure you can ask yourselves:

1. Does the Department of Veterans Affairs hold any policy against economically deprived minority veterans so as to hold them in derisions?

2. Does the Department of Veterans Affairs consider in any way, as a matter of policy, or otherwise, that just because a minority adult is also single and significantly indigent, (sufficient to be in need of use of a One Stop Center), he or she may in any way be classified by you as "disconnected" or, as "heavy users of services"?

3. Could all those benefits and preferences given to disabled veterans but withheld from veterans who may be minority and indigent but who are not otherwise classified by you as disabled veterans constitute a significant level of disparate treatment against disadvantaged veterans?

Now just on these three questions alone without consideration of anything else, in the event that you perceive that maybe, just maybe, the answer to any one of them could be "Yes", perhaps you should reconsider this claim. Instead of going directly to suit then, I offer you this opportunity to reconsider it, and please bear in mind that there is a matter of equity coming to bear here on my individual needs, as it is not appropriate for the continual adjustment of your policies to assuage the disparities on behalf of others, while I, who have to move at you through the FTCA process must remain indigent, and also barred.

Sincerely,

Radcliffe Bancroft Lewis, Claimant



# Radcliffe Bancroft Lewis



P.O. Box 2241, Washington, DC 20013-2241
Telephone: 202.664.3130          Email: rad_bancroft@hotmail.com

To:    Mr. Youngblood                                                    15 SEP 2006
       One Stop Office
       Department of Employment Services
       Government of the District of Columbia – And
       Department of Veterans Affairs
       1722 I Street, NW,
       Washington, DC 20036


Via:    **Hand Delivery**

Re:     Use of the One Stop Centers

Dear Mr. Youngblood:

This letter is provided to you as matter of reciprocal courtesy.

You indicated on Friday, 8 September 2006, your objection to our use of the One Stop Center at 1722 I Street, NW, D.C., (hereto hence "Center") and you inquired as to what transpired at the Minority Business Development Center at 64 New York Avenue (hereto hence "MBDC") to cause us not to utilize that center instead.  You are now presented with this response to your demand and inquiry as follows:

## I. Defining the relationship
**A. On "employee" and "employment"** – It is not our responsibility to venture to define for you what according to law an "employee", or seeking "employment" is, but we do suggest to you that such terms are not limited to those seeking contractual relationships operating under the tax structures of disseminated W-2 forms. If you beg to differ you need to defer further correspondence to the Office of the United States Attorney for the District of Columbia, or, in the alternative, your representative Regional Counsel for the Department of Veterans Affairs.
**B. On the duties and responsibilities of your newest coworker/colleague** – Regardless of how it is introduced to us, the new employee assigned to the Center is a *mission envoy* and the mission is to irradicate us.  Any other consideration represented to us, such as the idea that it is there to manage or oversee the Center, or is there on behalf of veterans affairs or the Veteran's Affairs, or, any other representation for that matter, constitute misrepresentations on the part of the Department of Veterans Affairs, as well as on the part of the Government of the District of Columbia, (hereto hence and inclusively the "Government").

## II. On Usage
In the event the Government has been keeping track of the situation, the summation of not more than 500 sheets of paper, 30 telephone calls, and 10 facsimile transmissions, all over the past fiscal year does not appear to be a heavy use of the Center's services, especially given the fact that the

1
**On a Matter of Standing**

 

## Radcliffe Bancroft Lewis

Government regularly discards large quantities of paper (the primary and inciting basis of your complaint is about the use of paper), and does not incorporate low resolution flat scanning-to-disk technology (scanners cost as little as $29.00), and this would be in keeping with the Paperwork Reduction Act (44 USC 3501 et seq.) § 3501, et seq.  If you beg to differ on these points, then you need to defer further correspondence to the Office of the United States Attorney for the District of Columbia, or, in the alternative, your representative Regional Counsel for the Department of Veterans Affairs.

### III. Regarding the MBDC

The MBDC is managed directly by three obscure entities:

A. Paul Williams (Williams) – an individual that appears to be like a project manager but does not appear to be an employee of the Government.  Williams takes offence at being asked to clarify its position, duties, and responsibilities, and such information, its qualifications, contracting process, or activities, are not readily discernable to the public.

B. "Michael" – an individual that apparently still "volunteers" at the MBDC, and is just as obscure as Williams.  Michael regularly eats at "So Others Might Eat" at 71 O Street, NW, Washington, DC., and has been apparently volunteering at the MBDC, without any benefit whatsoever at all, as it so implies.  Keep in mind that the MBDC is decidedly for "non-profit" and "for-profit" business development.  Michael "volunteers"; and is obscure to the public.

C. NCRC – This is not the National Capital Revitalization Corporation, but rather the National Community Reinvestment Coalition (NCRC), a private non-profit corporation.  That corporation had not yet taken control of the MBDC.  When they finally took over , they refused to disclose their proper identity or the nature of their relationship with the Government, but they apparently were granted full power over the MBDC.  They appeared to be so allowed by the Government, and were so protected.

### II What Transpired

A. Upon visiting the MBDC, members of the public were allowed access to the customary internet accessible terminal with word processing capability, limited printing, and telephone calls out, and access to facsimile communication.  We had to eventually meet with Williams to discuss our use of the facilities particularly if we were interested in learning about incubator space within the MBDC.

B. Upon meeting with Williams, it sought particular identification information, but did not adequately explain its relationship with the MBDC.  Being questioned, it was offended, and that was that.

C. After a few days coming and going, concerns arose in the MBDC that 'some people' were using too much paper.  Michael became overly concerned, just like you are here, but for us this was not a concern, as we had several places to go and print whatever we deemed necessary.

D. After a few more days, concerns arose, this time about use of the internet.  Michael became overly concerned that 'some people' were using the internet accessible terminals to do other things.  First the usual character assassination type accusations unfolded – people accessing chat lines, and people writing 'personal' emails.  These accusations were never affixed to a particular individual – all were held under suspicion.  Afterwards the less character assassinating but more restrictive accusations surfaced – people corresponding through their personal websites with other than business oriented messages; people doing research other than for business; people looking for jobs.  This effectively limited the use of the MBDC to making telephone calls out, and drafting business plans.

    Radcliffe Bancroft Lewis    

1. Researching online to develop business plans could be construed as doing something not related to entrepreneurship.

2. Communicating online could be perceived as doing something not related to entrepreneurship.

3. Drafting documents of any kind could be perceived as drafting for purposes other than entrepreneurship.

These kinds of decisions were to be made summarily without any definitive findings of fact regarding any particular person. Sounds familiar?

Incubator spaces were set aside only for specified business entrepreneurs.

For us the MBDC now only had limited value – proximity in commuting, limited telephone, limited fax (all inspected of course). Again, does this sound familiar?

4. After a few more days concerns arose this time about use of all telecommunication equipment – particularly that 'some people' where actually operating business from within the MBDC. Michael clearly indicated that the use of the MBDC was for business development, (drafting business plans and attempting to become eligible to utilize incubator spaces). No calls to clients or prospective clients were allowed. No trading or sale negotiations were allowed. If a client or prospect was to meet us this had to be done outside. Since we did not meet clients at the MBDC, or attempt to sell anything from within the MBDC, we did not concern ourselves with these matters.

5. After a few more days, it was further clarified that the processing of bills or invoices utilizing the word processors in the MBDC's main area was not allowed. Such privileges were reserved for those entrepreneurs who were allowed access the incubator spaces.

6. In comes Andrea Carter, a member of the public, an entrepreneur, who does not utilize the incubator spaces within the MBDC, but actually operates (buying and selling online) her business from computer terminals in the main public user area of the MBDC. She uses her own phone but accesses her website from there to call customers, take orders, fill orders, and do invoices. She usually sits at the terminal closest to Michael, who allows her to do what she does without any restriction.

9. NCRC – the private non-profit company, upon taking over compelled every public user of the MBDC to fill out a new intake sheet separate from the one the Government required of us to fill out. They demanded among other things, very personal information and our "dreams", and to affirm that each of our business ideas has a value of $500,000.00

8. This prompted us to ask the "who" and "why" questions:

a. Since NCRC did not identify itself as a corporation we needed to know who they were. Paul Williams was apparently the only individual with the answers and it was not going to share with us. Nobody else in the Department of Employment Services really knew. Not even D.C. Councilmember David Catania, or his staff, when asked, where able to provide any information on this second "NCRC", and his staff persons acknowledged that that Council hold oversight over DOES!

b. Why does NCRC need us to tell our "plans" and "dreams" before we complete our business plans and develop our business schemes?

c. What's up with the stipulated $500,000.00 collateral requirement on the yet to be developed business "dream" that the member of the public must affirm in promise before he or she may access the MBDC facilities?

> **Consider** – Were a criminal defense investigator contracted with the District of Columbia Superior Court on individually vouchered cases, to develop a portfolio, and netted $500,00.00 in one year, that could create a suspicion!

3

**On a Matter of Standing**



### Radcliffe Bancroft Lewis



Would such private contractors (or business entities) need an operating capital or collateral justifying equity of $500,000.00 to do such work for the courts?

After-all, obtaining assignments from the public defenders within that local court was a virtual guarantee.

d. What about the small business, photographers, plumbers, painters, tailors, cleaners, bakers, delis, small training schools, and such that may not be able to justify that their businesses may not be able to generate that kind of money, and so affirm to it? How do you do it and you don't get a steady contract? Why must we affirm now – before we plan?

9. Apparently I was not very good at filling out the NCRC "dream sheet", and I asked too many question, so one day one of the individuals of NCRC called security and had me escorted, not just from the MBDC, but the entire building.

## IV. Points of Concern

We now speak to you Mr. Youngblood, as well as to the Department of Veterans Affairs, the Department of Defense, and the Government of the District of Columbia, as well as your cohorts, (hereto hence all inclusively "you").

A. The Government throws away, even on a daily basis more paper than we could possibly use in one year at any of your One Stop Facilities:

> **Case Study** – The Armstrong Education Center was sold by the government for ten ($10.00) dollars. At the time of sale and years later there were many rooms filled with unused paper. Last year the government, in an arduous attempt to irradicate the squatters in that building, threw away more clean and usable in a printer 8/12x11 inch packages of paper, you could fill a condominium with without arriving at a critical mass to make the place a fire hazard.

Your problem then is not the excessive use of papers - your complaint about paper is only an attempt to develop exigency to obfuscate the use of the One Stop Center by certain members of the public.

B. The accusation of multiple copies made by those of us who use limited amounts of paper anyway with the ready on the tongue quip "This is not Kinko's", is insulting, demeaning, and illustrates the general attempt by you to consistently devalue that gravity of the considerations regarding overall access to the otherwise publicly accessible facilities and programs.

Given the amount of money that you invest into the centers, perhaps this micro-managing restriction, that an individual is only allowed one original copy needs to be upgraded to three original copies, so that at least we, the members of the public, can obtain reasonable use of the granted "fair use" of your publicly accessible printing equipment. This means three copies – one for the party we are attempting to communicate with, one for the presiding officer within that party, and one for our return of receipt of deliver files, stamped upon delivery. Why should an indigent individual go to Kinkos to print out copies 2 and 3 of a correspondence, especially when a full two of the three branches of the our various governments demand at the administrative, other executive, and judicial venues fair service of documents, which invariable requires proof of service. What is the development of legal business entities or, for the kind of individual that you favor there, the

4

**On a Matter of Standing**

 **Radcliffe Bancroft Lewis** 

affirmative delivery of credentials to prospective bosses and neo-masters, if not matters requiring certifiable delivery.

> **Think here** - In your education system, you indicate that black (dark chocolate colored "kinky" haired) people who are the biological progeny of the likewise dark chocolate colored "kinky" haired people that your ancestors rendered through significant misrepresentations, into chattel slaves "have no history" because there is no hard evidence, no written paper, left behind to affirm they had a written language prior to about 450 years ago. Given that fact, what right do you have now to even try to curtail my use of paper, or other "hard" as opposed to electronic or 'Akashic' formats to communicate literally to anyone else, or even *myself?*

Fair use is three copies allowed – that is – the original, and two.

C. The attempt to redefine "employment" to fit w-2 chasers and disenfranchise private contractors who get paid via form 1099's, is discrimination.

D. The setting aside of veterans who will submit to standard "w-2" type employment, while providing no benefits or access to facilities of business minded veterans is an insulting form of disparate action that includes the inferred libel, and, or, slander that a veteran is someone who should only seek what you consider to be "employment", but not build businesses. You certainly discriminate against veterans who have and hold ambitions to build businesses.

E. Your discrimination against veterans is further reflected in your misrepresentation of the benefits available to veterans under the Montgomery General Infantry Bill. You have stripped from the loan guarantee benefits, the provisions for funding guarantees if the veteran decides to utilize such benefits for the purposes of building or purchasing businesses. Given your finance-credit system, with its un-elected triumvirate of sciregerefas with whom you have compelled by circumstance, every member of the public to be listed, characterized, and graded on their eligibility to engage trade, and that without their initial consent, who in their right mind would seek alternative credit to purchase a house if they can't qualify for a regular housing loan guaranteed by that triumvirate, unless they consider that the only real reason they would be unable to qualify directly is because both their collateral holdings as well as their income potentials have been machinated away. The fact of the matter is that none of the VA loan guarantees were or other benefits was suppose to be linked in any way to the trade points system structures used by others to engage trade. For those rendered ineligible the both the standard credit system as well as for whatever reason, the inclination of the public not to sufficiently accept them for employment under the regular w-2 contract type labor and time for wages contracts, developing a small business or becoming a private contractor is the only way out for such an individual. Stripping away, or failing to inform veterans of, benefits available to building businesses constitute a significant disparate act and discrimination against ambitious minded veterans who know that a w-2 type contracting arrangement is not sufficient to properly matriculate them back into civil society as fully employed and productive individuals.

F. You already discriminate against us by refusing to provide any assistance whatsoever at all to us because we are not classified as disabled.

 

**Radcliffe Bancroft Lewis**

G. Upon learning that we have been working on a discrimination complaint for some time, something that actually is a barrier to our employability in any event, you derided me by asking "How long have you been working on that complaint?"

This new attempt of yours to institute a bar against our access to facilities actually occurs now just about a year and a day after the decision and remittance of a "final <u>appealable</u> order" by a previous federal judge where we had to file suit against you for obfuscating our Montgomery General Infantry Bill benefits for education.  Isn't it true that Dumas your colleague in that previous suit avoids all contact with us because he was one of the parties in that previous suit?
Truly you are very sleuthy indeed, because you sought to wait out our time to appeal before you move to retaliate against us for calling your misrepresentations then by filing suit.
Isn't it true that plan of yours to attack us for our <u>use</u> of your facilities was already formulated?
But did you not have fair notice back in 2002 that your devaluating treatment of us was a matter of concern necessitating a policy review?
Did you do that policy review?

Okay, what's really behind this question of yours then as to how long it is taking us to work on a civil rights complaint that we assert is a barrier to our employability?

If you did not accuse us right there and then of misrepresentation of the facts, you certainly uttered a question that infers that you perceive us as being disabled, and in any event misrepresenting our disability status (100% non-disabled) because we are not classified as disabled, and if disabled mentally so. This is discrimination.

H. Moreover, you will not get away with it; the timing of your disbarment ploy may be over one year and a day, and the strategic time tactic wait of your before you pounce is yet again retaliatory discrimination.

I. So let us keep this simple by indicating what you think of us, that we are *a lying nut*. If you perceive us as such then why are we not classified as disabled – is it not because you consider us not worthy of receiving the benefits that you pass on to other veterans, those classified as disabled?
Yet you venture to regard us as "honorably discharged" from the armed services.
Now consider this, do you not regard individuals who are discharged from the military before they die, or, in the alternative, or, in the alternative are rendered too disabled to continue fighting your wars, or, in the alternative, who retire after 20 years service, as people who *attrite*?
You do not consider that an able-bodied man who does not re-enlist as simply someone who did what he stated on paper that he is going to do, that is - serve the eight years, leave, go to college, and become a regular productive citizen – not a public charge.  The fact is you are angry because we did not sit there in the slave-realm-enlisted-ranks class (or *caste* rather, because that's how you see it), but instead we left "honorably discharged", and went forth employing the accessible portions of our negotiated severance packages; which include our saved EE bonds, use of the MGIB funds for education, attempt to utilize our VA loan guarantee for housing and business development, and access here in the District of Columbia, now, to facilities, where veterans are able to utilize information processing centers (which is what these "one-stop centers are) to seek employment as well as to address **"barriers to employment"** your words Mr. Youngblood. But this tendency of yours, to invite us into stuff, devise subtle forms of generalized esoteric libel and exoteric slander

**On a Matter of Standing**

 **Radcliffe Bancroft Lewis** 

against people like us – people who use your alleged stuff: your education system, your institution, your scholarships, your loans, your centers, your job billets, your internets, your computers, your telephones, your fax machines, your spaces, hell – your roads, your potholes, your paper, your ink, your air, your water - all that stuff that you have and think you own, thanks to taxpayer provided funding to you, for you, by you, giving you jobs looking over us, that enable you to pay your mortgages and leases for your living quarters, and your car notes, and feed your kids, so that they can learn your alleged knowledge in your schools, governed my your government – and then summarily, without any due process, any formal hearing, any consideration, any trial, any statute – bar us out like a bunch of cockroaches discovered walking across a shiny white floor – isn't that tendency of yours quite a barrier to our "employment"?

Who the hell made all this stuff yours?
Who fought your plunder wars for you?
Aren't you pissed quite a bit because we survived the 'cannon fodder route!

Isn't your motto for veterans to "take care of his widow and orphan" as opposed to his wife and children?
By default is it clear enough as illustrated, that in your minds or state of mindlessness (choose your pick), the only good veteran is a dead veteran.

We challenge you right now to call and certify our disability that you apparently perceive but that we won't acknowledge so as to cause us to be treated by you like we are liars and nuts.

But before you keep running about, (or climbing, or hopping about, whichever it is that you do) perhaps you need to go back to Paul Williams and its side-kick 'angel' Michael those abstracts managing the so-called "Minority" business development center which is subvertedly structured under the Department of Employment Services as opposed to some more appropriate department of the District of Columbia, where some private group can come in and use the living shit out of taxpayer provided resources to line their pockets under the guise that they are helping those "poor black people" while they hide their matriculation identities, business dealings, and source of authority and earmarked funding under the police powers of the state – and ask yourself a question – who is a heavy user of your expensive services?

ONLY when you are willing to take that mirror test and are able to pass it, can you have standing sufficient to step to us in a civil forum and try to prove your otherwise scant and unfounded otherwise apparent arbitrary and capricious accusation that we are your "problem". Hence the accompanying notice.

To the Kleptocracy

---------------------------------

Radcliffe Bancroft Lewis

 Radcliffe Bancroft Lewis 

## Certificate of Service

Radcliffe Bancroft Lewis, Claimant, hereby declares under penalty of perjury that on this 15th Day of September 2005, has caused this letter titled "Re:      Use of the One Stop Centers" dated 15th September 2005, together with a copy of a relevant "95-108 Previous editions not usable NSN 7540-00-634-4046 Standard Form 95 (Rev. 7-85) PRESCRIBED BY DEPT. OF JUSTICE 28 CFR 14.2" titled "CLAIM FOR DAMAGE INJURY, OR DEATH" as well as an accompanying Letter of Repudiation of, Notice of Renunciation, and Declaration of Independence from the Peoples Demand for a Bachelor's and Other Undergraduate Degree in Order to Secure Access to Employment, Contracts, Matriculation, or Other Opportunities, be delivered by hand delivery where possible, and otherwise by first-class mail postage prepaid to the following parties

To the United States Department of Veterans Affairs

Via:

Tim S McClain , General Counsel
Office of the General Counsel
Department of Veterans Affairs
810 Vermont Avenue NW
Washington DC 20420

And Via:

Department of Veterans Affairs
Office of Inspector General
Freedom of Information Act Section (53B)
810 Vermont Ave., NW
Washington, DC 20420

And to the United States Department of Defense

Via:

U.S. Department of Defense
Deputy Assistant Secretary of Defense, Equal Opportunity
4000 Defense, The Pentagon, Room 3A272
Washington, DC  20301-4000

And to the Government of the United States of America – Executive Branch

Via:

U. S. Department of Justice
Civil Rights Division
Coordination and Review Section

**On a Matter of Standing**

     Radcliffe Bancroft Lewis     

950 Pennsylvania Avenue, NW
Washington, DC 20530

And to the Government of the District of Columbia, *et rama*

And pursuant to Rule 27, to

Darlene (Seals), Esquire
Office of Robert J. Spagnoletti
Attorney General for the District of Columbia Office of the Corporation Counsel
441 4th Street, NW, Suite 1060N
Washington, DC 20001     (202) 727-3400,

(Who upon attempt to gain consent on 15 September 2006 at 1300, was not available),

As well as to

Robert Bobb, City Administrator and Deputy Mayor for Public Safety
Office of the Mayor
Washington, District of Columbia, New Columbia, Subsidiary Municipality of the Congress of the
United States of America, the City of
1350 Pennsylvania Avenue, NW
Washington, DC 20004,

And to the Government of the United States of America – Legislative Branch, and the People
thereof so governed

Via:

Congress of the United States
C/o Eleanor Holmes Norton
District Office- Washington DC:
National Press Building
529 14th Street, Northwest, Suite 900
Washington, DC 20045

And:

Anthony Williams, Mayor
District of Columbia
1350 Pennsylvania Avenue, NW
Washington, DC 20004

Via:

Office of Risk Management

9
**On a Matter of Standing**

    Radcliffe Bancroft Lewis    

441 4th Street, NW,
Washington, DC 20001

And

David Catania, Councilmember
District of Columbia Government
1350 Pennsylvania Avenue, NW
Suite 110
Washington, D.C. 20004

And

Pursuant to 4 USC 41, 41, 71, 72, and 73, and 5 USC 2902

To, and on behalf of the People and Nation and Sovereignty and Government regarded as the United States of the America, *et legio*

Office of the Counsel
Department of the State and Keeper of the Herald Great Seal of the United States of America
Office of Information Programs and Services
A/ISS/IPS/RL
U. S. Department of State, SA-2
Washington, D. C. 20522-8100

Office of the Legal Adviser
Department of the State and Keeper of the Herald Great Seal of the United States of America
L/EX Room 5519
U.S. Department of State
Washington, D.C. 20520-6419

And as a matter of protocol to

Those officers appointed to supervise Anne Wicks, Embodiment of the District of Columbia Government – Judiciary Branch, Associate Justice,

Via:

Pursuant to 5 USC 2902 (C)
Office of the Counsel
Department of the State and Keeper of the Herald Great Seal of the United States of America
Office of Information Programs and Services
A/ISS/IPS/RL
U. S. Department of State, SA-2
Washington, D. C. 20522-8100

10
**On a Matter of Standing**

    Radcliffe Bancroft Lewis    

As well as

Valenine Cawood, Division Director
Office of the General Counsel
Judiciary of the District of Columbia
500 Indiana Avenue, NW, Room 5008
Washington, DC, 20001

As well as to

Herbert Jackson, Equal Employment Officer
On behalf of The Government of the District of Columbia and the Government of the United
States for the Judiciary of the District of Columbia
616 H. Street, N.W., Suite 612.02
Washington, DC  20001.

**On a Matter of Standing**

2008 - 0421 - 2051

To the District of Columbia

Office of the Deputy Mayor for

Planning and Economic Development,

**Enhanced Business Information Center**

901 G Street, NW

Washington, DC 20001

Subject Matter:  <u>Progress Report</u>

### INTRODUCTION

It is our understanding that the Enhanced Business Information Center holds

responsibility to foster entrepreneurship in the District of Columbia by providing

training, consultation, and support for entrepreneurs.  Recently it has come to our

attention that the Center is also responsible for matters of "compliance" and

"enforcement", or in the alternative "compliance enforcement".  It is one of several

centers that we are aware of in the District of Columbia gauged toward assisting small

and disadvantaged businesses, as well as towards assisting the productivity minded

individuals in developing their respective portfolios by building business plans and

becoming more keen to the process of business operations, especially in relation to the

established standards of government.  This Center has been significantly supportive to

the Firm during the past several years through which we have experienced certain

revelations regarding the mindset and business atmosphere here in the District of

Columbia.

### ABOUT THE FIRM

Radcliffe Lewis Enterprises, SP came about as a result of several entrepreneurial ventures by the Founder, Radcliffe B. Lewis. These ventures include: Photography by Radcliffe, FileShrimp, and Radcliffe Research and Investigations.

## Photography by Radcliffe

Photography by Radcliffe was the first true entrepreneurial endeavor by the Mr. Lewis who was a college student at the time. The endeavor branched out from his studies in the field of visual arts, and helped to fund his college expenses. That endeavor involved a simple process: to engage freelance photography assignments. Butressed by the availability of the college's (Montgomery College, Rockville, Maryland) studios and equipment, the endeavour netted a nominal amount of about US $150.00 per assignment. Upon leaving Montgomery college Mr. Lewis had amassed about three camera systems, (one small format slr based, one midium form tl based, and one polaroid), three computer systems (one dedicated to file and database management, and two for graphics manipulation) and a libary of about 80 books related to photography and graphics modeling and business practices. All this was packed into a basement where he had one room and a small makeshift studio. This arrangement was surprisingly attractive to his network of potential clients, and he had began to engage more into the the finer arts (sketches and detailed drawings). Armed with his first portfolio of about 33 photographs and drawings, Lewis changed the name of his fledgling firm to Studio Radcliffe and eventually developed an online forum in an attempt to increase both exposure and expertise in the quickly developing field of Web Design.

## FileShrimp

Due to the emergent policies of government, financial underwriters, and the education institutions themselves, Lewis faced significant financial difficulties while attending the

University of Maryland, both the College Park and its University College campuses, and found the fixed studio arrangement unstable. Considering the field of Photography and Fine Art to be a little too constrained when balanced against his resources, he then developed an idea of assisting other small businesses with office management, particularly organizing office files, development database and web communication processes using available online resources, and developing client databases. The first flyer marketing of FileShrimp produced a contract of US$450.00 and a susequent contract of about $300.00.

Though FileShrimp was off to a good start, Lewis encounted two sources of adversity. The first of these was the loss of a family member's business due to events that eventually proved to be the onset winds of 'gentrification'. Lewis became aware of the second source of adversity when he then sought to explore possibilities for business development. Upon discussing the new FileShrimp business model that was at the time buoying him, with a counsellor from the SCORE program of the Small Business Administration, the counsellor only had one suggestion for Lewis, and that was for him to "trim your whiskers and look for a job". Obviously, the SCORE counsellor not only failed to take Lewis seriously, but failed to see any potential in either Lewis's business model or Lewis for that matter. FileShrimp eventually failed to take off, not because it was a poor business model, but because family duty called, as the proprietor of Quality Fashions met with failing health, and Lewis was tasked with overseeing the closure of that business with as little liability damage to the proprietor as possible. Lewis aviated a safe crash landing to the master tailor's shop, and thereafter was on his own to develop his own enterprises.

## Radcliffe Research & Investigations

Lewis moved closer to the downtown area of the District of Columbia primarily to oversee ongoing litigation affairs regarding his next of kin, the pursuit of millions of dollars from which his family member was defrauded. The location required him to start anew. Armed with merely the Studio Radcliffe online forum and his resume, Lewis was introduced to the city's Criminal Justice Act Investigator Program, and in a few short weeks became an investigator on behalf of criminal defendants. The knowledge base which he developed as an office administrator for Quality Fashions and the overseer of his family's then failing business served him well to navigate this new endeavor, however the contract procurement process proved to be unstable. The entrepreneur only took this in stride and expanded the service offerings of his firm from serving mere criminal defense counsels to serving the larger society, and went about developing the terms and conditions of the newly created Radcliffe Research and Investigation, SP.

### A Common Platform

With both his committment to Studio Radcliffe and his income earning via Radcliffe Research & Investigations, there was a need to find a reasonable way to bridge the gap between these two endeavors which on the surface seem as different as night and day. The unifyer is that for all practical purposes, the essential assets required for either of them at the start-up level are the same: an office, imaging hardware and software, excellent research faculties, mastery of litigation and investigative techniques, excellent visual presentation systems, solid transportation and communication processes, and eventually expert publication systems. As Lewis proceeded to concretize his business endeavors, the registration and compliance requirements meshed well with the unifying factors of his entrepreneurial activities thus far, giving birth to Radcliffe Lewis Enterprises, SP.

**STRUCTURE OF THE FIRM**

Radcliffe Lewis Enterprises, SP is classified as an unincorporated franchise registered in

the District of Columbia. The term "unincorporated franchise" is the term given to

proprietorships by the DCRA. The "SP" designation is our coined term for "sole

proprietorship". Accordingly, the Firm is named after its Founder, and the

"Enterprises" indicates the nature of the business - that being it is an entrepreneurial

development organization.

Succinctly put, the purpose of the Radcliffe Lewis Enterprises, SP is to be a legitimate

organization housing all, or most of the enterepreniurial activities of its Founder(s) in

such a manner to lay a foundation that does not inhibit the breath of innovative ideas

that the Founder(s) may have. Thus Radcliffe Lewis Enterprisess registeres as a sole

proprietorship in order to contain the assets, particularly the intellectual property assets

of its Founder, so that the assets do not become subject to the control of parties other

than the Founder as Entrepreneur. This structure appears on its face to be risky

because there is no division of assets between the Founder and the Firm. Conversely

however, it is our opinion that it is the safest approach to developing innovation and

retaining flexibility in initiatives, because it enables the Entrepreneur as Innovator the

freest leverage in generating ideas without losing the security of knowing that the ideas

generated will not be taken away before the Innovator has an opportunity to mold them

into productive assets. It provides the greatest opportunity for us to develop the

productive assets or resultant business model into a workable enterprise by not

hindering the ability of the Innovator as a Freeman to move and thrust in whatever

direction he deems necessary to yield a workable business platform. Unlike

corporations which are not allowed to own tax-exempt non-profit organizations, and

non-profit organizations which do not own the resultant equity of its business

endeavors, and in many cases may not even own its own developed intellectual property,

the Sole Proprietorship in niether hindered from branching off a parcel of its developed assets into a full corporation, nor into a full non-profit organization.

Within the Firm then, parcels of assets or endeavors are grouped together into "Portfolios". and those Portfolios are further subdivided into Divisions. The Firm itself is able to have its own departments and divisions, which would be tailored toward assuring the administrative integrity of the Firm or its Portfolios, and not necessarily as business operations without the status of Portfolios.

Currently the discipline of the Firm is to engage actual business operations under the ensign of the Portfolios, and or Divisions of Portfolios, but not in the name of the Firm outright. Nevertheless, all Portfolios and, or subdivisions thereof should indicate somew on invoices and agreements that the Portfolio is a "Portfolio" or "Division" of the Firm. As most members of the public are familiar with the idea of a business being a division of some other business and not a "portfolio" the word "Division" is oftne used.

So far the Firm has three Portfolios, "Studio Radcliffe, Radcliffe Research and Investigations, and Intellexae, which started out as a subject matter and performance arm of Radcliffe Research and Investigations, but which has now become recognizable in its own right as a fledging think tank and Portfolio. Intellexae has one evolving franchisable subdivision called FindingsDC. Table 1 below provides a diagram of the current stucture of the Firm.

## Table I.
## General Structure of the Firm

---

### Founder
*Entrepreneur, Innovator, and Sourcer of equity and goodwill asset of the Firm and its Portfolios*

**Radcliffe Lewis Enterprises, SP**

*(RLESP)*

**Departments**

| Administration | Compliance and Enforcement | Accounting | Marketing & Public Relations | Publications |
|---|---|---|---|---|
| Responsible for ascertaining smooth operation of the business, development of Terms and Conditions, and adjustment and structuring of mission, Departments and Portfolios. | Responsible for enforcement of terms and conditions, risk management, confidentiality and non-circumvention issues, litigation, security, and asset protection. | Responsible for fiscal analysis and documentation. | Responsible for development of strategies to enhance goodwill assets, and market access. | Responsible for publication logistics management, web-tech interface, printing and distribution, market packaging and transportation. |

**Portfolios and Subdivisions**

| Porfolio/Division | Subdivision |
|---|---|
| Studio Radcliffe | Virtual Studio |
| | Portfolio |
| | Forum |
| | Online Stores |
| | Foundation *(defunct)* |
| | Vitallitae - Journal of Art Review |
| Radcliffe Research & Investigations | |
| Intellexae | Findings-DC |
| | Intellexae - Journal of Public Policy Review |

_____*r*_____

### Summary of Structure

As the reader may therefore observe, the Firm currently has three Portofolios, Studio Radcliffe, Radcliffe Research & Investigation, and Intellexae.  As indicated, the Studio Radcliffe Foundation is currently not operative.   Additionally, there are two publications named Vitallitae, and Intellexae, both journals of review in their respective disciplines.

Moreover there are five embrionic Departments of the firm that carry the burden of the shared operative requirements of the Portfolios in an effort to maintain smooth operaton of the Portfolios and Firm in relation to the environment in which they must develop.

### THE ENVIRONMENT

The municipality of the District of Columbia is also the location of the Seat of goverment of the United States of America. The Federal District is a politically oriented society. The impact of that orientation is profound in the business society here. The preeminent private business industry is the law society. There are in excess of 82,000 attornies registered in the Bar of the District of Columbia. For those that are not located in the District of Columbia or the sorrounding area, there are more than enough professionals of the legal profession to more than make up for their absense in relation to the business culture in the area.

This is significantly different from, for example, Los Angeles, where the preeminent industry is the visual arts. Although there are many legal and public relations experts in that metropolis, the atmosphere is geared nonetheless to the visual and performance artists there. The business culture is therefore difference. There is an excessive demand their for style and flambuoyance upon which visual artists such as photographers and graphic designers may thrive. Here in the District of Columbia, the food of the industry is information, not visual excitement, and thus the thrust of business understandings is different.

But because the District is also the Nation's Capital, and thus a political hub, the direction of control in this District, is that of political formalities. the District of Columbia Bar has positioned the policies of government to enable the most opportune environment for its members at the expense of other experts in the literary, research, and public relations fields. With a unified Bar of both the local and federal jurisdictions, the Bar and the government has been able to impose a restrictive definition of "law practice" such that currently it is even illegal for those who are not members of the Bar to engage contract drafting or counseling, without encroaching upon the gray areas of legal practice. Moreover, the Bar restricts its members from contracting with

individuals who are not members thereof to provide counselling services. Thus in this way the Bar acts more as a trade guild from which others must give way even if they are better at providing tactical strategic and public relations counselling than the litigation expert attorneys-at-law of the Bar are able to do. The Bar even restricts investigative services to the authority of attorneys to the point where investigators are only allowed to perform investigations "under the bar numbers of attorneys." Furthermore, investigators who are not military veterans and who register their firms in the District of Columbia are not allowed to utilize the tools of their trade such as ballistics thrusting devices in order to provide their expert services. This puts them at a significant disadvantage to investigators who may be located in the surrounding states. If a private security firm is allowed to possess such devices, the firm is required to keep such agents at specific locations such as at a particular door post only, and the agent is neither classifiable in any degree, or is considered in any degree as an "investigator". In fact, for all practical purposes, the District of Columbia treats investigators as they do private security guards without guns. Added to the fact the guild does not allow attorneys at law to contract with investigators but only to hire them as employees, the business environment for researchers and private investigative firms not under contract with government itself is all but crushed unless the firm is headed by an attorney-at-law registered to the DC Bar, the guild, and treated not as a security firm, but as a law firm. The tentacles of the guild even reach the threshold of lobbying firms and policy action agencies, as even they too have come to grips with the fact that their own amicus curie briefs may have no standing with the government unless it is signed by an attorney of the Bar. Thus in this environment only the government is able to hire investigative firms.

As for veterans of the United States Armed Forces who are not attorneys-at-law and desire to develop investigative firms, the government has another angle with which to

deal with them. Though it may be commonly understood that those who have completed their military service and have been honorably discharged are not compelled to become members of the the militia, the District of Columbia compels such veterans who engage in investigative professions to register their organizations complete with insignia with the Metropolitan Police Department, thus compelling them once again to become members of a regulated militia - without compensation. In fact they have to pay, for the registration and earn a living at the same time. Morover the as we indicated earlier, the District of Columbia makes no differentiation between investigators and security agents. According to the DC ST 47-2839 all such individuals are classified as "Private detectives, or detective agencies, by whatsoever name called..." and this clause "by whatsover name called..." gives the inferences that such individuals or agencies attempt to artfully evade law, thus undercutting their percieved public perception, even if they refrain from such classification as "detective" and adjust their business modules to match. Thus under this construction of the DC Code statute any individuals in the professions indicated in Table 2 below may be declared at any time by any authority of government to be a "detective" and if not registered below the lowest ranking constable may can be found in criminal violation of law at a whim.

### Table 2.

**Given a generic definition for "Detective" as "*A person whose work is investigating crimes or obtaining hidden evidence or information.*"**

*(Dictionary.com),*

**Below are some of the professions susceptible to being criminalized by the District of Columbia at a whim under DC ST 47-2839**

| Advocate | Handyman | Paralegal |

Accountant

Analyst

Critique

Blogger

Bookkeeper

Business Analyst

Consultant

Computer Analyst

Critique

Devolopment Analyst

Documentary Photographer

Engineer

Entrepreneur

Filmmaker

Film Director

Finance Analyst

Government Critic

Guide

Guru

Health Advocate

Herbalist

Historian

Homeopathic Aromatherapist

Information Specialist

Investigator

Investigative Journalist

**Insurance Investigator**

Journalist

Kinesiologist

 Lecturer

Librarian

Linguist

Litigation Agent

Litigaton Assistant

Locksmith

Marketer

Market Analyst

Office Assistant

Office Designer

Organizer

Perfumer

Playwrite

Photographer

Poet

Project Manager

Publicist

Quality Assurance Consultant


Researcher

Research Analyst

Reserch Specialist

**Scientist other than**

**Engineer\**

Systems Analyst

Socialite

Technologist

Translator

Urban Planner

Video Analyst

Visual Artist

Visual Designer

Web Developer

Zoologist Researcher

**Just to name a few.**

We consider the great leeway  that the District of Columbia gives itself to criminalize individuals on a whim to be a tade imposing and invasive.


Clearly those who are handicapped are not very effective investigative operatives other than to be private analysts, because the profession requres significant ambulatory dexterity.