motion for leave of time

TO THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

Radcliffe Bancroft Lewis, *Pro Se*

**_Plaintiff_**

vs.

The District of Columbia Judiciary, Et al

**_Defendants_**

**Case No: 1:07-cv-697-rjl**

**MOTION FOR LEAVE OF TIME TO FILE CLAIMS FOR RELIEF**

*Pursuant to FRCP 6(b)*

Plaintiff Radcliffe B. Lewis respectfully requests that this Court grant leave to time for the filing of the accompanying Claims for Releif, the final portion of his reponse to the defendant District of Columbia's motion to dismiss. On 29 April 2009 Counsel for the District consented to this motion. See Exhibit #1.

There are three reasons why Plaintiff seeks this leave of time.

1. As indicated in his previously filed Second Response, he was again accosted with yet another disbarment on the deadline for filing his response.

2. This disbarment however lead to the discovery of more pertinent information regarding the structure of the District of Columbia, thus information not yet affirmed

but relative to the nature of the claims.  The details thereof are indicated in the accompanay Claims for Relief.

3. It is in the Defendants' interest for this filing to be and the case not dismissed because the latest action on the part of the "US Department of Veterans Affairs Regional Office of Employment Services" a District of Columbia agency, only reignites the matter, it would only reapear in a few months.  This too is explained further in the Claims.

For the foregoing, comes now the plaintiff in hope that his motion be Granted.

Respectfully submitted.

Radcliffe B. Lewis, Plaintiff Pro Se

1901 15th Street, NW, Washington, DC  20009

RECEIVED
2008 MAY -2 AM 12: 40
CLERK
US DISTRICT & BANKRUPTCY
COURTS

## Proof of Service

*Pursuant to LCvR 5.3*

I, Radcliffe B. Lewis hereby declar that on this 1st day of May 2008, I caused a copy of this Motion for Leave of time to be served upon the defendants as follows:

To the following parties:

Government of the District of Columbia,

C/o Secretary of the District of Columbia

1350 Pennsylvania Avenue, Washington, DC 20004,

To the United States

C/o Claire Whitaker, AUSA, The United States Attorneys Office

555 Fourth Street, NW (Room 10808), Washington, DC 20530, and

Kara Petteway, Assistant Attorney General,

Office of the Attorney General for the District of Columbia,

441 4th Street, NW, Suite 1060 N, Washington, DC, 20001,

Sign:

Consent Briefing Form

2008 - 0429

## **Request**

Where:    Having been thrown out of 1722 I Street for working on this pleading on Thursday, complicating filing and cognition of pleading and limited access to formatting necessary for the courts.

**Needs Consent for Leave of Time to File Pleadings as Follows:**
Claims:
Construction of Claims and Justification

Joinders:
Include other offices held by Leighton
Include DVA
Include DC – (specifying DOES, US DVA ROES, DP-PECD, and NCRC-2 if necessary)
Include DOT if necessary

Injunction:
Grant Certification (Matriculation)
Allow for acquisition of DL/NDL and Passports w/o mooting case
Grant allowance of 100k pending resolution, or in the alternative $500k if DOT not incl.
Grant non-interference from DVA, S-M, other federal claimants

**Justification**
Disbarment from 1722 re-ignites cause of action
Discovery of relation between DVA ROES and DC ODM –PECD
Continuance is in interest of opposing parties – or additional suits

**Alternatives**
New suit six months from now
Appeal and injunction nonetheless

**Consent**

| | | | | | | |
|---|---|---|---|---|---|---|
| USA – Whitaker | 2/514-7173 | y | n | other N/A | time 1000 | |
| DC - Petteway | 2/442-6522 | y | n | other N/A | time 1002 | |
| | 2/662-4519 | yo | | | 1004 | |

TO THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

Radcliffe Bancroft Lewis, *Pro Se*

**Plaintiff**

vs.

**Case No: 1:07-cv-697-rjl**

**MOTION FOR LEAVE OF TIME TO FILE CLAIMS FOR RELIEF**

The District of Columbia Judiciary,  Et al

**Defendants**

---

*Order*

Upon consideraton of  Plaintiff's motion for leave of time the motion is

Granted.

Sign: _____ Judge

TO THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

Radcliffe Bancroft Lewis, *Pro Se*

**Plaintiff**

vs.

**Case No: 1:07-cv-697-rjl**

**CLAIMS FOR RELIEF**

The District of Columbia Judiciary,  Et al

**Defendants**

---

*Pursuant to FRCP 8(a)s*

**Construction of Claims**

**The Standardized Civil Jury Instructions Rely on the DC Code.**

1. The construction of the Court's Jury Instructions (hereto hence the "Bad Law") relying on the DC Codes and the standards for remedies in the District of Columbia when supplemental jurisdiction is applied in this Court makes it difficult for the pro se plaintiff to appropriately frame his pleading with clarity of relief sought respective to the Federal Questions raised.

**Agents of the District of Columbia Act to Hinder the Progress of Plaintiff's Instant Pleadings a at a Critical Time.**

2. The additional attempts the by agents of the District of Columbia to hinder the efforts of his claim to court in response to the standards of the demand of their own counsel, by again barring him from the US Department of Veterans Affairs Regional Office of Employment Services effectively ruptures that the plaintiff even asked of this court to grant in so doing. (Plaintiff here

invokes consideration of F.R.C.P. 6(b).)  The said employment services offices answers to the one Tommy Abner, a "Veterans Coordinator" and agent of the District of Columbia.

**The Rules of the District of Columbia and the Department of Veterans Affairs Converge to Degrade the Publicly Perceived Character of the Plaintiff.**

**3.** This unforeseen situation coupled with the work of the plaintiff in simultaneously addressing the inquiries of the yet another agency in the District of Columbia, the Enhanced Business Information Center, sheds light on the existence of statutes and decrees affirming what the Plaintiff already sought to complain about, administratively as well as through suit: that the actions of the various agencies of the District of Columbia in promulgating DCCA Rule 49, DC ST 47-2839, and the real United States Department of Veterans Affairs's strategy for action, the ECH converge to create barriers to employment and or contracting sufficient for his own economic development.

**The District's Agents Outside the Judiciary Involved are the Ones Most Tasked With Adhering to the Department of Veterans Affairs Strategy For Action.**

**4.** As indicated in Exhibit 4 of Plaintiffs Amended Complaint filed on 14 April 2008, we now discover that both the Department of Employment Services of the District of Columbia as well as its "Office of Local Business Development" as well as the District of Columbia Housing Authority are under the same "Deputy Mayor for Planning and Economic Development".

**Though the District's Agents Appear Coincidentally to act in Parallel yet Simultaneously to Deprive or Disbar the Plaintiff, They Also Appear to Fail to Communicate Openly, Yet All Actions, Law, Plannings, and Communication Points Appear to Consolidate Under "Planning and Economic Development".**

**5.** Thus we see a situation where despite the submissions of notices of intent to pursue litigation pursuant to DC ST 12-309 to the District's Office of Risk Management, and Secretary of the District of Columbia, as well as various Freedom of Information Act requests and other letters to various agents of the District of Columbia over the years, there exists a high degree of mis-cognition, or non-existent communication between the various agents of the District of Columbia. **(Consider Exhibit #1 hereto: copy of Plaintiff's 4 April 2005 Letter to Whitaker.)**   This includes:

**6.** The Office of the Mayor of the District of Columbia; the Outgoing Mayor; The Incoming Mayor;

**7.** The Office of the City Administrator; the Incoming and Outgoing City Administrators;

The "Deputy Mayor for Planning and Economic Development" (Ref: Expect More), wherein are the Department of Consumer and Regulatory Affairs, the Department of Employment Services, the Department of Housing and Community Development, the Office of Local Business and Local Development, the Office of Planning, and the District of Columbia Housing Authority; the Deputy Mayor for Public Safety and Justice, and the Metropolitan Police Department.

**The Department of Veterans Affairs is Inextricably Involved.**

**8.** Even though counsels for Veterans indicate they have nothing to do with the "One Stop Center" located inside their regional headquarters and performing liaison affairs for Veterans, we see that Veterans is also the author of a policy that guides the operations of offices that are under the District's Deputy Mayor for Planning and Economic Development.  This includes agents of the District governing business registration, employment, housing, and business development; all

of the areas where plaintiff has been diminished upon Brenden Wells refusal to matriculate him.

**Wells, and the PDS are Positioned to Direct the Targeting of the Machinery of, and be Directed against *Subjects* of Planning and Economic Development of the District, and Thus Against the Plaintiff.**

**9.** We see that Wells is a high ranking investigator in the District's Public Defender Service, an independent agency in the District a federal statutorily created (Pub. L. No. 91-358, Title III, § 301 (1970); see also D.C. Code § 2-1601, et seq., 2001 ed.: Ref: Public Defender Service, FY 2009 Budget Justification, 4 FEB 2008) and federally funded, independent organization of the District of Columbia that also publishes "an exhaustive resource guide to assist attorneys in locating public and private social service agencies and organizations in the Washington, D.C. metropolitan area that provide housing, treatment, counseling, and other social services to indigent people." (Ref: http://www.pdsdc.org/LegalCommunity/TrainingCPI.aspx).  This is the Public Defender Service commissioned by the DC Courts to certify investigators.

**a.** Moreover, the District's Deputy Mayor for Planning and Economic Development (Economic Development) houses one of the first places a newcomer to the city may be directed to in order to be properly situated, particularly to underline homelessness.  Unlike the District's Department of Human Services (which issues food stamps), the District's Office of Human Rights, and the Child and Family Services Agency (CFSA), the D.C. Housing Authority (DCHA) is tasked with providing a specific social service - that of affordable housing, yet it reports to Economic Development.  Now the DCHA is known in the local public for its latency in addressing the needs of minority individuals in the District who may have experienced a bout of homelessness,

such as an economically marginalized minority veteran who may be a newcomer to *any* city, such as the Plaintiff was in the early part of January 2002.

**b.** The DCHA also answers to the United States Department of Housing and Urban Development (HUD/Housing) and also appears on the District own organizational chart as independent. *Ibid.* It even has its own police force separate from the Metropolitan Police Department. Also like the District's "US Veterans Affairs Regional Office for Employment Services", the DCRA's sister agency on the federal level, this HUD/Housing is one of the trilateral publishers of the ECH. Given the PDS publishes its own resource guide for attorneys serving indigent clients to be able to contact social service agencies, and Wells being a high ranking investigator therein, it is reasonable to conclude that he is at least somewhat aware of the vast amount of indigent veterans in the local area.

**c.** Wells refused to accept a DC Department of Human Service identification from Lewis, and refused to accept the previous CJA Investigator Identification bearing very personal information (name, date of birth, signature, fingerprint, photograph) that Lewis and other investigators were allowed to order from a private business prior to institution of the PDS/D.C. Courts' issued investigator identification card), and even Lewis's voter registration card, but Wells did not declare that it did know what they are. Wells's reaction to Lewis's veterans identification card was entirely different,

"I don 't know what that is" said Wells.

**d.** Even without clearance to access the NCIC, the least that Wells would have access to are all the locations of all the social service agencies that deal with such matters as housing on the one hand, and employment services on the other, and Lewis, upon entering the city and being

prodded by various local guides, registered into both the DCHA and DOES believing them to be social services agencies reasonably tasked to at least provide information regarding affordable housing and employment opportunities, not business services agencies. In fact, the ECH addresses the involvement of housing and job placement agencies [**note Exhibits 2 and 3: Excerpts from the Department of Labor's Website regarding "Supporting Housing Program"**, and **Table 1 on page 23 of the ECH Action Plan edict, indicating "Employment Services" as "Supportive Services",** respectively] in its efforts to preserve them [**Exhibit 4 footnote assuring "programs" and "applicants" to programs that budget resolutions first**], as the United States carries out its action plan to "irradicate" the supposed subject of such programs (chronic homelessness). Therefore, though they are organized stucturally as government to business related government departments under under the Deputy Mayor for Planning and Economic Development (DMPED) here in the District of Columbia, the DCHA and DOES are regarded as social service (SS) agencies by the United States. But ~~bont~~ *not* being one to remain complacent on depending on SS handouts, Lewis not only sought employment, but also continued to interact with District agencies involved with the United States Small Business Administration in order to rebuild his onw business. As the Office of the DMPED holds not less than two agencies that must comport with the guidelines of not less than two federal agencies who authored the ECH, and as PDS purports to be a federally funded independent DC Government Agency, the PDS and its own agents are obliged to follow through in the regulations of those agencies, and thus the guidlines or principles of the ECH. Federal Register: July 18, 2003 (Vol, 68, No. 138). Conversely, those agencies withing the Office of DMPED are obliged to follow through and summarily arrest, disbar, or exclude any who Wells/ PDS declares to be not credible.

**e.** Consider, as the PDS is a publisher of the guides for attorneys to locate social service agencies, it is reasonable to blelieve that Wells, a high ranking investigator therein would know

of these agencies; DCDHS, and DOES.  But if they are not protected by teh generally understood confidentiallity and privacayh affored to the individual records of members of the public that register in them, then any competent investigator armed, especially one armed with general consent t acquire information from them is more than capable of obtaining information about particular individuals without such stop gap considerations as a medical related subpoena signed by a sitting judge.  Moreover, if the such individuals or their general characteristics are averaged and the resultant profiles derivable by the accessible records are grouped and classified by the local government as business related information, any prospective employer or contracting agent would be entitled to have access to the generel profile so adjudged by government and the authority thereof.  **Consider Exhbit 5: Excerpts from 2008 Neighborhood Profiles, published by the Washington, DC Economic Partnership, a "public sector partner" with the District of Columbia under the sitting mayor.**  Therefore if the social services agencies such as the Department of Veterans Affairs passes gner information to a local business agency such as the DCHA or DOES purporting to be local social service agencies, such information becomes readily available to any prospective contractor or employee.  If the Departmentof Veterans Affairs passes information indicating that single adult minority indigent veterans who may be in need of housing or employment may be "disconnected" and be "heavy users of services" as indicated in the ECH [Exhibit 6: ECH Chapter 2 page 10 and 11] this would also pass to the local housing and employment services agencies, and to maintain their relationship with the federal government or funders such as HUD and the Department of Health and Human Services, they would be obliged to follow through on the policies of te funder federal agents.  However there would be a conflict of interest because the same housing and employment services agencies would also be obliged to please prospective employers and providers of the cities tax base, and this would include Brenden Wells, the indivudual most charged with "acknowledging to the public" that Lewis "is a person identified, accepted, and certified by the Courts (based on a

background check, proper identification, etc) to be available to be hired by court-appointed criminal attorneys." Document 17-2 Page 7 Filed 10/22/2007.

**f.** If the ECH indicates, as it does, that generally speaking minority indigent veterans subject to homelessness may not credible because they are "heavy users of services", the very fact that Lewis possessed a US Veterans ID card made him appear suspicious enough to incite threat in Wells and for him, just like Youngblood and his colleges at 1722 I Street, NW, as well as the now corporation status revoked NCRC that governs the One Stop Center at 64 New York Avenue, NE (at least back then in 2005), to "call the marshalls" (Wells) or "security" (Youngblood) to have Lewis removed from the building whenever he embarks on doing anything in order to develope himself economcally.

**g.** Thus given the structure of the District as it relates to the unrestricted passage of private information from an individual through SS agencies to the business community on the one hand, and the unrestricted grouping of informtion by private business members in relation to the availability of profiles derived by the nature of how individuals enter the District registration systems, coupled with the conflicting dual allegiances of the SS agencies need to adhere to federal profiling on the one hand and their overseers, the higher officers of the District of Columbia and prospective employers/contracter/certifiers such as the D.C. Public Defender Service, It is incredulous to believe that a high ranking investigator of a purported federal government agency does not kow what a United States Armed Forces Veterans Identification card is. Plainttif now asserts that actually Wells knew. The more pertinent question then is what it meant to Wells, and the Federal Register Vol 68, No. 138 is at least one of the many places the provides the answer. A single adult minority veteran desiring job, contract, or market certification who already had to file suit because he as no money left (Lewis v Wallace) who

already fumbled out of his wallet a poor man's ID card (the DC DHS ID Card) can only be in the eyes of the laws that Wells follows, a "heavy user of services". **Ibid.**

**10. What we have here is a situation where a high ranking investigator of the federally mandated and funded independent agency operated by privately appointed government agents has been able to trigger the planning and economic agency of the Federal District to systematically disrupt the planning and undermine the economic viability of one individual on an ongoing basis by coordinating various agents of the District to timely act be it in policy, statute, regulation, or calling the marshals or security to bar that particular individual from time to time out of a government buildings, or otherwise, and to do so guided by the United States Department of Veterans Affairs Strategy for Action to irradicate the Plaintiff.  (In that ECH, there is no differentiation between irradicating chronic homelessness, and irradicating the ones beset by that disease.)**

**11.** Finally in completing the delineation of the actions of the various parties, upon completing the sections immediately above in this document, and attempting to properly evaluate the actions of the various parties relative to damages, plaintiff in his research on 30 March 2008 came accross 5 USC 3108 wherein the Congress legislated into law not only the disqualifying of employees of a specific private company, but also employees of all "similar organizations". So it it here we have the latest in the discoveries so far of barriers to the employability or contractability of the plaintiff.  Considering that Lewis answered the call to the duty of his nation not less than three times:

**a.** He enlisted in its naval forces whereupon the veteran of both Desert Shield and Desert Storm was honorably discharged from active duty;

**b.** He completed his tours of duty respective to his contractual obligations as a mariner of the naval reserve forces without attrition, whereupon he was honorably discharged from the Selected and Active Reserves and achieved membership in the Standby Reserves thereof; and

**c.** He heeded the call of his nation and so serve he dutifully carrying out the responsibilities of the Congress and the courts as mandated pursuant to Amendment 6 of the United States Constitution to provide for individuals charged a process of obtaining witnesses in such charged individual's defense;

**12.** Yet upon being mistreated and dismissed by Wells and the courts for no good cause, he attempted to move on and in attempting to make the best of his then broken wings, he compiled his abilities into the form of a private company and in accordance with the requirements of law and regulations, properly registered his business and the nature thereof.  **See Exhibit #7, secured information.**

**13.** For this Lewis has been treated like a disqualified person, one not to be employed and not to be contracted with, he having fallen into the open sepulchre of a profile dug by the Congress with its shovel law, 5 USC 3108, wherewith the Congress itself abated legislated into law the undoing of its own governance with the blanket profile statesment "or similar organization". Therein he becomes triangulated yet again by the District of Columbia' Court of Appeals Rule 49 with its then overreaching definition of practicing law on the one hand, and the defaming ("by whatsoever name called...") stated DC ST 47-2839 on the other barring him from obtaining information for compensation without relinquishing is Standby Reserves status by registering below the District's police officers, without compensation.

**14.** So on the one hand Lewis is defamed by the triangulating profiling of the authors of the ECH, their subject agencies in teh District, and the company of Wells, Leighton, and the D.C. Judiciary, and on the other hand his business affairs is estoppelled by the triangulating discrediting of the 5 USC 3108, the repetitive disbarring of him by agents of the District of Columbia (both the judiciary oand the executive) and the District's own DC ST 47-2839.

**Claims for Relief**

**15.** The claim of the plaintiff are based on the misdeeds of the defendants as detected by the plaintiff's comprehension of his acknowledged rights interpretive to the Bad Law (those questionably standardized civil jury instructions) and evaluated commensurate with his identity. Counts I through XIII below are those indicated in the Amended Complaint. Claims are now affixed to Counts X though XIII. The Additional Counts are new.

**16. COUNT I - Breach of Contract** - *Pursuant to Bad Law 11.01 through to 11.33* - On a particular date of 28 January 2004, the District of Columbia by and through its agents Brendan Wells and Lewis Wallace refused to provided Lewis an investigator's identification card, a credential which he vied for and earned by complying with the CJA Investigator Program administered by the District pursuant to 18 USC § 3006A. In so doing, Wells and Wallace breached the agreement made between the District and Lewis whereby were Lewis to comply with particular terms and meet certain standards developed by the District of Columbia Judiciary, and included therein Wallace, and administered to through Wallace and Wells as instructors and background investigators, Lewis would be "acknowledged to the public that" he "were a person identified, accepted, and certified (based on a background check, proper identification etc.) by

the Courts to be available to be hired by court-appointed criminal attorneys." 2 The District of Columbia breached this agreement to Lewis' detriment.  Plaintiff now seeks

**INCIDENTAL DAMAGE** of one thousand and one hundred ($11,000.00) dollars, and

**CONSEQUENTIAL DAMAGE** of one hundred thousand ($100,000.00) dollars.

**17. COUNT II -** **Retaliation** - *Bad Law 11.31 though to 11.33* - In breaching the agreement as indicated immediately above Wells and Wallace's acted immediately after Lewis inquired as to what constitutes "Identification", and in so doing retaliated against Lewis for no other reason than that he asked a question. Plaintiff now seeks:

**CONSEQENTIAL DAMAGE** of one hundred thousand ($100,000.00) dollars.

**18. COUNT III - Defamation by Omission** - *Pursuant to Bad Law 17.01* - As the certification identification card constitute the means by which Lewis could obtain access to the payment account system to which such identification cards are attached, Wells and Wallace also removed Lewis from the roster of individuals qualified to receive payments for services tendered to court appointed attorneys perchance they actually hired him, thereby removing the means by which such attorneys could hire Lewis even were he not otherwise acknowledged by the District to the public as one accepted and certified by the Courts to be available to be hired by such attorneys. This removal of Lewis – the omission of his name and account from the active accounts of payable "investigators" results the casting of him in a degraded light among his professional peers; fellow investigators, and court appointed attorneys, as well as other members of the legal profession, thus instantly defaming Lewis, the effects of which were immediate and continuous to this day, remaining a load factor against the goodwill value of Lewis's business affairs. Moreover –

**19. COUNT IV Defamation – Libel/Slander** - *Pursuant to Bad Law 17.01* - When questioned regarding the affair and their subsequent decision to uphold the decisions of Wells and Wallace, The District of Columbia by and through its agents Rufus King and Anne Wicks authorized a third party third party the authorization to communicate that Lewis never contracted with the courts, but in the same communiqué admit that information gathered from Lewis and the certification program to which he was subject was "to acknowledge to the public that (Lewis was) a person identified, accepted, and certified (based on a background check, proper identification etc.) by the Courts to be available to be hired by court-appointed criminal attorneys." Lewis was identified, he was accepted, and he was declared certified subjected to a background check, but he was denied certification, without justifiable cause, or if cause, cause communicated, and thus the District though holding out Lewis's name to the public as one attempting to be "acknowledged by the District to the public" as hirable by "court appointed criminal attorneys" the District then removed his name as one who succeeded in making that attempt, one who the District omitted from the list of those whom it can acknowledge to the public as hirable by "court appointed criminal attorneys. The District thereby castes disparaging shadows upon the character of Radcliffe Bancroft Lewis, as one who firstly is not credible, and secondly, one who attempted to be regarded as credible when his is apparently not credible. The District thereby amplified the defamation of Lewis beyond that of the legal profession to all professions the effects of which were immediate and continuous to this day, remaining a load factor against the goodwill value of his business affairs. This for this and in relation to statement 15 above Plaintiff now seeks *pursuant to Bad Law 17.13:*

**COMPENSATORY DAMAGES** in the amount of two million ($2,000,000.00) dollars, and

**DECLARATORY ORDER** to properly matriculate Radcliffe Lewis into the CJA Investigator Program.

**20. COUNT V - <u>Denial of Due Process</u>** - *pursuant to Bad Law 5.10* - Moreover, the response from the King and Wicks came in excess of two years after the incident and inquiries made by Lewis, and by no means were proffered in any venue that was formerly allotted for administering such disputes. The District by and through King and Wicks, denied Lewis any formal due process for him to petition the government for redress of his grievance after the breaching of the agreement that the District made with him.  Whereby Plaintiff now seeks:

**DECLARATORY JUDGMENT** that Plaintiff has duly exhausted all available administrative processes, and this Action is ripe for adjudication by this Court, and for a

**DECLARATORY ORDER**  so as to cause the availability of a speedy and impartial process of redress of disputes arising regarding the availability of access to those subject to the terms and conditions under which the defendants administer the CJA Investigator Program, or, in the alternative, for the allowance of the terms and conditions of the business practices of each such service agent to be the standard under which such service agent is able to engage and provide services to the courts "criminal attorneys".


**21. COUNT VI - <u>Misrepresentation</u>** - *Pursuant to Bad Law 20.01 throught to 20.05* - The District of Columbia, by and through King and Wicks, also refuse to acknowledge that any agreement relating to 18 USC 30006A made between Lewis and of its own court appointed attorney were in any way an agreement of intent on its part. Thus the District of Columbia denies that it ever engaged any agreement with Lewis, never minding the fact the evidence exists that such agreements were already in existence.


**22. COUNT VII - <u>Neglect</u>** - *Pursuant to Bad Law 5.10* - Thus the District of Columbia completely overlooks the umbrella agreement, to wit: matriculation into the CJA Program of its own design.

Whereby now Plaintiff seeks:

An **ORDER** declaring that the Agreement between the District and Plaintiff in keeping with such description as laid out in section 46 of Plaintiff's Amended Complaint is in fact an enforceable agreement which Plaintiff has fulfilled, and thereby

**23. COUNT VIII - <u>Denial of Due Process by Leighton</u>** - *Pursuant to Bad Law 20.01 throught to 20.05 and Bad Law 5.10* - Regarding "Julia Leighton, then the Deputy Chief of Legal Services of The D.C. Public Defender Service"

In all of these actions, The District of Columbia by and through its agent, Julia Leighton, was a present witness and contributed to the oversight of the actions of Wells. Leighton sat in the classes offered by the District's Public Defender Service (PDS), listening to and contributing to the words that Wells evoked concerning the structure of the Program. At first it appeared that Leighton was a fellow student, then it became apparent that Leighton is an agent of the District, indicating on query, the billet as "General Counsel" of its Public Defender Service. However, in terms of her activities, Leighton is much more than that: Leighton acted as the co-instructor not just for the Criminal Justice Act program as it relates to candidate investigators undergoing training, but also as an administrative member and lecturer for the Criminal Practice Institute, another program geared more for appointed attorneys under the Criminal Justice Act. Moreover, Leighton is also involved as an administrator and architect of yet a third program of PDS through which PDS procures law students to act as and be investigators for attorneys employed by PDS to represent indigent clients charged with climes. By her own words, Leighton has indicated her belief in utilizing law students to be investigators instead of professionals, such as are under the CJA Program, yet she oversees both programs as both architect and lecturer. In fact, as of 2006, it is confirmed, Leighton has become more than just the General Counsel for the PDS, Leighton is and has also been an officer of the DC Courts beyond the scope of a mere attorney (officer of the Court). Pursuant to DC Courts Administrative Order 06-04 Leighton now sits on several

committees including the Criminal Rules Advisory Committee, the Committee on Continuing Legal Education for Criminal Justice Act (CJA) Attorneys. A search of Leighton's activities with the District yields the here presented "REPORT OF THE SUPERIOR COURT CRIMINAL JUSTICE ACT CONTINUING LEGAL EDUCATION COMMITTEE (CJA/CLE COMMITTEE) FOR CHIEF JUDGE RUFUS G. KING, III, DECEMBER 3, 2002" indicating that though Leighton represented itself as the "General Counsel" to PDS, by the time Lewis became an investigator under the CJA program, Leighton managed to position itself as a full member of one of the DC Judiciary's committees that governs the "education" of members and contractors within the CJA program. Yet as of 5 September 2007, Leighton remains the "General Counsel" for the PDS. Thus Leighton is intricately involved with the District's CJA program from assisting in the design of it, to the overseeing of it, and the operations of it, and this includes the availability of form avenues of redress whenever a formal complaint, such as the on filed by Lewis (ibid) is concerned. As the apparent day to day manager of and apparent overseer of the education process of CJA investigator candidates, and thus and examiner of the Program particularly with respect to program structure information dissemination as well as an attorney for the PDS, Leighton holds positional authority to determine whether both the PDS and the D.C. Judiciary avails Lewis to a process of redress regardless of the subject matter of his Complaint.

**24. COUNT IX - <u>Misrepresentation and Neglect</u>** - *Pursuant to Bad Law 20.01 throught to 20.05 and Bad Law 5.10* - The District of Columbia by and through its agents Wells, Leighton, and Sullivan, upon, in its own developed training sessions respective to the Program instructed Lewis that in the event he has any questions to refer the matter "to the Chief Judge". Nevertheless, the "Chief Judge" had no formal process through which to address Lewis's complaint. Still, upon receipt of the Lewis's tort claim notice, these agents took no action. Thus the PDS, as well as the D.C. Judiciary first misrepresented to Lewis the idea that it had a formal grievance process for those who contracted with it, and then it completely neglected Lewis'

formal complaint to not less than two separate agencies to wit: the District of Columbia Courts, and the District of Columbia's Public Defender Service. Whereby with regard to statements 18, 19, and 20, above, as well as the statements in this section, plaintiff now seeks *pursuant to Bad Law 17.13 as applied:*

**COMPENSATORY DAMAGES** in the amount of three million ($3,000,000.00) dollars.

**25. COUNT X - <u>Denial of Due Process</u>** – *Pursuant to Bad Law 5.10* For its part the United States by and through its agency (Labor) provides to members of the public an avenue for filing civil rights complaints where contracts are concerned by way of completing is "Form CC-4 – Complaint of Discrimination in Employment Under Federal Government Contract" pursuant to Executive Order 11246, and therein instructed such complainants that whereas the complainant must "use this form to file a complaint of discrimination in employment under any of the OFCCP Programs..." the "failure to provide the information will restrict the action that the Department of Labor can take...and, for matters covered by Title VII...or the ADA may affect (the complainants) right to sue under those laws." Nevertheless, un learning the that Lewis completed form includes about 200 pages of information simply refused to accept it because according to the speaker on the other end of the telephone line, Lewis complaint was "too large".

**26. COUNT XI - <u>Denial of Due Process Right of an Indigent Citizen</u>** – *Pursuant to Bad Law 5.10* For its part the United States by and through its agency (Justice) refused the complaint thereafter simply because the by then very indigent and cash-strapped Lewis could find no other effect method to get the complaint to Justice except by way of hand delivery, time being of the essence on that then 180 day after the incident in that regard.

Whereby with regard to statements 22 and 23 above, plaintiff now seeks *pursuant to Bad Law 17.13:*

**COMPENSATORY DAMAGES** in the amount of three hundred thousand ($300,000.00).

**27. COUNT XII - <u>Defamation and Willful Neglect</u>** – *Pursuant to Bad Law 17.01, 17.13, and 5.09* - The United States by and through its Department of Veterans Affairs for its part willfully neglected the harm done to Lewis through its mischaracterizing policy edict though it received information and a formal tort claim notice of the harm indicated, and in so doing influenced the public at large to regard Lewis, a properly honorably discharged veteran of the United States Armed Forces12 as a "disconnected" "heavy user of services" thereby exacerbating Lewis condition of economic marginalization by rendering him as not fit for employment with "suspicion" (Rufus King). Moreover the Department of Veterans Affairs holds policies that effective discount the idea of the existences of an honorably discharged veterans of the naval mariner forces who is actually not-disabled. For this the Plaintiff demands a claim of relief as follows:

A **DECLARATION** that the United States Edict, "Ending Chronic Homelessness does not apply to plaintiff because the plaintiff.

A **DECLARATION** that the plaintiff, though a veteran, is not disabled.

An **ORDER** rescinding the strategy for action compiled by the Department of Veterans Affairs.

An **ORDER** for the restoration of Plaintiff's second amendment acknowledged, and other rights which have been impinged upon by the United States and its agents as a result of the actions of the Department of Veterans Affairs.

For **COMPENSATORY DAMAGES** of ten million (USD $10,000,000.00) dollars.

**27. COUNT XIII - Deprivation of Rights under Color of Law in Repugnance to The Constitution of the United States, Article 1 Section 10** - *Pursuant to Bad Law 5.09* - The

District of Columbia is a Federal Legislative District of the United States, with the Congress of the United States holding "sole legislative" capacity therein. The Congress develops two sets of laws to wit: The District of Columbia Home Rule Act of 1973, and the Revised Criminal Justice Act of 1986 enabling a delegated authority to further legislate into authority a subsequent Criminal Justice Act therein inscribed in the District of Columbia Code. At the same time the United States through its Congress legislates by way of Title One of the United States Constitution the District of Columiba Superior Court and ratified the appointment of a Chief Judge to govern that Court. That Chief Judge operating at the behest of the Congress of the United States as so appointed by the President of the United Stats now develops the administrative protocols by which the District of Columbia Judiciary, Wicks establishes the operational precepts of the Criminal Justice Act as implemented within the District of Columbia. However, when questioned both King and Wicks indicate through their Equal Opportunity Officer of the Court that "there was never any intention on the court's part to establish an employee or contractor relationship between the CJA Type Investigators and the Courts..." and that "Judicial 'employees (perchance Lewis may be so defined) are not covered under the Court's Comprehensive Personnel Policies." Nevertheless neither King nor Wicks indicate any other policy under which the relations between Lewis and the Court may be addressed, and none of this appears to be reviewed or address by the Congress of the United States. Thus, the United States and the District of Columbia by and through the Congress of the United States and King, and Wicks, now allow to pass, the legislation of and subsequent administrative development of a set of laws that enables the District of Columbia to circumvent its contractual obligations under the predication that "Judicial 'employees' are not covered under the Court's Comprehensive Personnel Policies." Whereby the plaintiff seeks:

A **DECLARATION** that Plaintiff and other like CJA Investigators has standing to enforce his financial interests for payment of services rendered so as to comply with the Constitution of the United States;

An **ORDER** for full review, overhaul, and reform of the CJA Act in relation to the independence of investigators from attorneys-at-law, to assure a proper and enforceable agreement in relation to duties performed pursuant to Amendment 6 of the United States Constitution;

An **ORDER** for full review, overhaul, and reform of the structure of the District of Columbia Public Defender Service to assure that organization complies with the mandate of the United States Congress, and subject to the jurisdiction of the District of Columbia Home Rule Act where its public officers can be held responsible to the District of Columbia Counsel and where the structure and all billets thereof can be clearly defined and available for public scrutiny.

### Additional Claims

**28. COUNT XIV - <u>Fraudulent Misrepresentation and Multiple False Arrests</u> - In keeping with statements 4, 5, 6, 8, and 9 above -** *Pursuant to Bad Law 20.01, 18.01, 18.02, 18.05, and 18.06 -* Where the United States Department of Veterans Affairs has allowed to pass unhindered the full veterans file information of a United States Armed Force Veteran, the Plaintiff into the hands of the Deputy Mayor for Planning and Economic Development of the municipality of the District of Columbia in that characterization, under the pretext that the US Department of Veterans Affairs Regional Office of Employment Services, which is not managed and controlled by the United States Department of Veterans Affairs plainttiff seeks for

An **ORDER** removing the entirety of any files related to his status as a Veteran of the United States Armed Forces from any office governed by the District of Columbia, including his social security number, the nature of this discharge, any personal and or biograhic information, and any profile report related to such status, as well as

An **ORDER** disbarring the District of Columbia from holding on any of its so-called One Stop Center the seal of the United States in relation to the United States Department of Veterans Affairs, and

An **ORDER of ESTOPPEL** to bar the District of Columbia from engaging in any activity where it provides any counseling to veterans of the United States Armed Forces, and

**COMPENSATORY DAMAGES** in the amount of three million (USD $3,000,000.00) dollars.

**29. COUNT XV - <u>Deprivation of Rights Under Color of Law</u> - U.S. Constitution Article 1, Section 10 and 8 U.S. Code-** -Pursuant to Bad Law 12.01, 13.01, 24.02 and 25.05 - where both the Congress of the United States and the District of Columbia have enacted laws restricting the free excercise of commerce on the plaintiff simply because of the nature of his profession - a general researcher and investigator, and

**30 COUNT XVI - Fraudulent Inducement** - *Pursuant to Bad Law 20.02* - where the Congress of the United States, the District of Columbia, the Public Defender Service, and the agents therein held out the supposed need for plaintiff to embark upon such a profession as indicated immediately above without disclosing the terrorim of the various statutes, 5 USC 3108, DCCA 49, and DC ST 47, thereby creating barriers to the manner in which Lewis as a private citizen would then attempt to lawfully engage business respective to his profession, and where upon having disclosed significant personal information he was then barred  from engaging a first market related to the profession, then upon again disclosing singnificant personal information in attempting to recooperate commercially therefrom he discovers he as been profiled as one to be barred and barred again plaintiff now seeks:

An **ORDER** rescinding 5 USC 3108 as a lawful statute,

An **ORDER** rescinding DC ST 47,

An **ORDER** entitling Lewis to so engage his resultant profession of research - investigator without being compulsed or conscripted in any wise into the activated militia of the defendants, or subject to be commandeered by their police, constabulatory, or law inforcement officers as one who is subject to their registration, monitoring, and descretionary licensure merely by virtue of his profession; and

**COMPENSATORY DAMAGES** in the amount of one million and five hundred fifty and five thousand ($1,550,000.00) dollars.

**31.** Moreover as plaintiff is an honorably discharged veteran of the naval forces of the United States, whose own readiness has depreciated and atrophied as a result of the overall long term lure, keel-haul, monitory deprivation, profiling, defamation, estoppel, and force conscription attempts of the defendants, plaintiff now seeks:

An **ORDER OF RESTORATION OF RIGHTS** affirming that as one sworn to allegiance, to protect, and to enforce the Constitution of the United States and one honorably relieved of his obligated enlistment <u>under officers appointed over him</u>, such honorable discharged stands, in accordance with 10 USC 12306, 12316, and 12304, such that neither he nor his firm may be compelled to serve in the militia of the District of Columbia, not be conscripted by the United States without compensation, and

An **ORDER OF RESTORATION OF RIGHTS** such that the plaintiff's full rights as acknowledged by the Constitution of the United States, Article 1, Section 10, and Amendments 1 and 2 are restored.

An **ORDER** rescinding the District of Columbia's ban on private detectives, or investigators bearing arms.

**32. COUNT XVII - False Arrest and Fraudulent Inducement: the Subversion of Access to the Courts -** Pursuant to Amendment 1 of the Constitution of the United States

Finally plaintiff takes exception on his reliance on the Bad Law here and addressess it directly: Where the District of Columbia by and through the District of Columbia Bar, The District of Columbia Judiciary, King, and others as standardized a set of jury instructions so as to enlarge to the jurisdiction of the codified laws legislated by the Counsel of the District of Columbia to the point where such codified laws govern the interpretation of judgments derived in this Court more than the laws legislated by the Congress of the United States, plaintiff now seeks:

An **ORDER OF REFORM** so as to cause the committees of the the United States District Court of Columbia to cease control the standardization process of the juty instructions, or to certify such control to the Disrict of Columbia Circuit so as to put an end to the subversion of judicial interpretation when federal questions, laws, and treaties of the United States are to be decided by this Court.

### Conclusion

**33.** But because the same Jury Instructions include a terrorim declaring

**"A person is not justified in relying upon a false representation if he knows it is false, if falsity is obvious to him, or he had no confidence in the misrepresentation..."** *(Section 20.02 E)*

the Court should note this further inherent disbarment of any claimant who may seek to contest the viability of the Standardized Jury Instructions. That same publication states,

"A fact is material if it is a fact that the maker of the represenation knows would likely be important to the person to whom it is made, even if a resonable person would not think that fact is important. Nader v Alleghney Airlines, Inc., 1980." (Section 20.02 B (Elements Defined))

34. *Erickson v Pardus* provides a reasonable standard for Lewis, a pro se litigant to state his claim. Lewis was accepted into a program designed to enable him to market process service and investigative services to attorneys. He fullfilled the training requirements but was denied certification. He was also denied due process in seeking redress of the denial of certification. This occured after Lewis had already suffered significant financial harm. He confidently maxed out two credit cards not excpecting the Government of the District of Columbia to significantly dely payments to him, which to his dismay they did. By the time he was denied certification he was already finanicially destitute. At the same time time Lewis had already observed peculiarities in the manner in which he was being treated by education institutions and others on account of his being a veteran of the United States Armed Forces. He had already complained about this for years, to the Department of Veteran's Affairs, his then Senator Barbara Mikulski, eventually to others in Congress, and the Deparmtment of Justice. He raised the issue with persons in the community who he thought were assigned to assure veterans of the armed forces are treated with dignity. But upon being rendered financially destitute again, he found himself being summarily barred here and there throughout the city by the very offices and agencies that he thought were there to provide employment and housing information, then by offices in the District of Columbia geared toward entrepreneurship. But neither the governments of the United States or District of Columbia appeared to pay attention to his claims or allegations for that matter. Eventually the actions of the DC Courts and the rest of the District, as well

as the purported "US Department of Veterans Affair Regional Office of Employment Services" were ~~two~~ close, ~~two~~ symbiotic, and as Lewis developed a civil rights complaint against the DC Courts, the actions of the Department of Veterans Affairs could no longer be dismissed. They denied having any influence over the very employment service office that was inside the building where their D.C. regional headquarters are located, and they developed (Lewis discovered) a set of regulation which when he read appeared to paint single minority veterans as pathologically "disconnected" "heavy users of services" (*homo clepsi* if you will). Nothing in the regulation explains how the Department arrives at the conclusion that veterans are this way. It simply suggest that a "work group" was convened and over a period of time came up with these conclusion. The regulation stresses however, that many *minority* veterans are the ones that are this way, identifiable by of all things their meager resources. Then it direct the public to uses the very portals of social services to observe the individuals who go to those places: food places, housing assistance resource places, and job training and placement service centers, among them and suggest those who interact with society at those places are persons having the "characteristics" of persons "experiencing homelessness".

**"HHS, HUD, and VA have agreed on the characteristics of persons experiencing chronic homelessness and use the following definition in their collaborations:**

**An unaccompanied homeless individual with a disabling condition who has either been continuously homeless for a year or has had at least four (4) episodes of homelessness in the past three (3) years."** (*Ending Chronic Homelessness - Strategies for Action Ch.2 page 13*).

**35.** The implication of this could not be more profound: this kind of profiling of minority veterans just because they may be indigent can only be detrimental to any

minority veteran who is indigent, even if not disabled, and not matter what he or she does, once rendered in that capacity the mindset of the public can only be to keep that individual as far away as possible. For the plaintiff, especially with the abrupt denial of access to the very parts of government that engages judicious deliberative decision making, the courts and commissions such as the civil rights commissions, the message was all too clear: he is profiled as a homo clepsi, a "taking man" without evidence. It is for this reason he MUST persue the very form of deliberation which he is systematically deprived, and it is only available in a court of equity.

**36.** This kind of shallow explanation of mass diagnosis of others is something that can be readily abused because it plays upon the fears of even the most fare minded of individuals. I am almost convinced that were I even granted a hearing, the judge on the bench would be extra careful to watch his own pen and any extra paper his may have, any paper clip, even the gavel. Those who feel threatened by the proximity of a man who has been to war, especially if he has won, in relation to his ability to compete and win, could all to easily become induced to strike him down using this blind knife approach, this secrete indictment, that such a man is not one of us - he takes things. This is what the Department of Veterans Affairs has done to minority veterans, but there is no Congressional oversight or judicial deliberation on the issue. It is a mass arrest scheme perpetrated agianst those who have served this nation in a time of war such as the plaintiff. This scheme of the Department has been underway for some time now, but his is not mentioned to veterans, especially those being discharged from the armed forces confident that they have set their minds on a goal - to be honorably discharged in accordance to their contracts - and have accompished it; certainly not to the young high-schoolers who are all too ready and willing to risk life, liberty, and limbs in answering the call of duty to the nation.

**37.** It is a dis-service to taint the image of a these young men and women with this kind

of profiling just because they forfeit money for duty and are rendered not too rich, but are

willing to then move on in life and build from the bottom again, believing they are

regarded as honorably before those for whom they risked life and limb. It should not be

difficult for those who are the beneficiaries of that service comprehend the cause of this

action then and the basis of the claims, and why the plaintiff then directs the

court deliberation relative to such issues as indicated in 10 USC 12306.

But instead, the defendants in this action moved for a very restrictive interpretation

derived from Twombly v Bell Atlantic Corp., and the plaintiff has obliged their demands

seeking to address this matter by delineating the specific acts of each defendant.  In so

doing he only discovers insight to some degree of their inner workings culminating into

the discovery of 5 USC 3108 where the Congress of the United States itself engaged in

blacklisting of investigative professionals just on account of their profession not their

character, and it does not appear that code has been amended even in the presences of

better legal construction by which to identify and delineate disqualified persons.  The

Congress of the United States may have sole legislative jurisdiction over the District of

Columbia, but it does not have sole legislative jurisdiction of the body or property of

individuals, to blanket them and school them up in profiling schemes.


**38.** So the plaintiff has made an attempted here to meet these defendants in their terms

only to end up with a large amount of claims due to the dimensions of the impropriaties

discovered so far.  Had the defendants not made a federal case out of a simple denial of

one of its agents at the very least this case should have already been resolved, with the

plaintiff appropriately compensated sufficient to recover from the damages and

re-establish his business.  But becuase to the languishing of time, the aspiring 33 year

old man the stepped into the Public Defender Service's Training program, became the

39 going 40 year old perpetual indigent have been mass profiled in cormobid schemes

by interacting agents of both government intent on stopping the progress of minorities who are veterans of the post 1964 era United States armed Forces.

Why?

These are the veterans who are the progenies of those women who were victims of "Jim Crow Laws" throughout most of the 20th century, who were raped with fire hoses just because the sought a little bit of dignity in their lives - are the not?

**39.** WHEREFORE The Court should consider well the dynamics of these matters before moving toward a dismissal of the plaintiffs case. Moreover plainiff urges the Court consider these matters and the claims presented in a liberal sense, for it is not just a matter of misrepresentation solvable by money damages as the those strange Jury Instructions could lead to the reader to consider, it is a matter of the degree to which those charged with assuring the fidelity of the Nation are integruous to that end. One thing the plaintiff has learned regarding the progeny of the people who are not satisfied with the semblance of equality and dignity that the Civil Rights Act of 1964 and others like it have enable both the Black and the White and others to continue on as on nation is that in this adversarial judicial system kindness is regarded as a weakness. The otherwise kind-hearted plaintiff is thus not at liberty to stay his hand. If that is a failing on this part, that is not a matter for him to consternate about. It is suffice to say that it is not appropriate that on who has been secretly indicted on account of is lack of opulence be it in material, rights, priviledges, or access, upon surviving that tarring and feathering must now rest easy only with moderation, and dwindable compensation there for. For that reason the amounts asserted in this Action stands, and the value of the claims culminate to nineteen million eight hundred and sixty and on thousand (USD $19, 861, 000.00) dollars plus declaratory, reform, and other releifs.

**40.** So now comes the Plaintiff Radcliffe B. Lewis before this Honorable Court.

Respectfully submitted.

_____

Radcliffe B. Lewis, Plaintiff Pro Se

1901 15th Street, NW, Washington, DC  20009

## Proof of Service

*Pursuant to LCvR 5.3*

I, Radcliffe B. Lewis hereby declar that on this 1st day of May 2008, I caused a copy of this Claims for Relief to be served upon the defendants as follows:

To the following parties:

Government of the District of Columbia,

C/o Secretary of the District of Columbia

1350 Pennsylvania Avenue, Washington, DC 20004,

To the United States

C/o Claire Whitaker, AUSA, The United States Attorneys Office

555 Fourth Street, NW (Room 10808), Washington, DC 20530,  and

Kara Petteway, Assistant Attorney General,

Office of the Attorney General for the District of Columbia,

441 4th Street, NW, Suite 1060 N, Washington, DC, 20001,

Sign:_____

RECEIVED

2008 MAY -2 PM 12: 42

CLERK
US DISTRICT & BANKRUPTCY
COURT

Respectfully submitted by:

Radcliffe B. Lewis, Plaintiff *Pro se,*

1901 15th Street, NW, #4, Washington, DC 20009

**F.R.C.P. 5 Notice**



**Radcliffe B. Lewis**
19 Eye Street, NW, Washingto[
DC 20001
Email: radcliffego@justice.con
Tel: 301 412-0801

4 April 2005

To: Scott A. Whitted
Room 103, 71 Kimball Avenue
South Burlington, Vermont 05403

and

Clair Whitaker, Esquire,
United States Attorney
555 4th Street NW
Washington, DC 20001
Via: Hon. Rufus King, III, Chief Judge
District of Columbia Superior Court
500 Indiana Avenue
Washington, DC 20001

Subject : <u>Claim for Damages</u>

Dear Mr. Whitted and Attorney Wittaker:

I am in receipt of Mr. Whitted's 18 October 2004 request for information pursuant to 28 CFR 14.

You requested 1)"documentation of (my) status criminal investigator, such as a copy of a letter of appointment or other certification, 2) the "name of the agency or entity that issued the criminal investigator identification to (me)", and 3) and explanation of the "relationship between the August 12, 2004 incident and the suit filed in the U.S. District Court, DC Circuit, No 04-600 (GK).

    I.  You are hereby provided reference to DC Superior Court Administrative Order 02-24, which should be documentation sufficient to address your first query. A full copy of this administrative orders may be obtained on the internet at:
        http://www.dccourts.gov/dccourts/superior/admin_orders/admin_orders.jsp.

    II.  You are advised to review DC ST § 11-2605 District of Columbia Official Code. In the event you remain unclear in regards to your second query, pursuant to DSSC

Administrative Order 02-13attachment § VI. B. I refer you the Chambers of the Chief Judge of the Superior Court of the District of Columbia.

III. You may refer your third query to your own files and the documentations, opinions, and determinations of the United States District Court for the District of Columbia in Lewis v. Wallace 041-600(GK).

Additionally:

I. You are instructed to consult with each other and present a unified face and voice, in addressing this issue, which Claire Whitaker promised the United States District Court, would occure.

II. You are instructed to disclose the linear chain of command from the arresting officer in question to wit: "Officer Smith" of the Federal Protective Service, through to the Secretary of the Department of Homeland Security, detailing the name, address, office, billet description, authority, and oversight responsibilities of each and every person/entity from "Officer Smith" through to the Secretary of the Department of Homeland Security, inclusive, and

III. You are hereby instructed to disclosed in detail the training that officers of the Federal Protective Services receive in relation to recognizing persons engaged in activities pursuant to 18 USC 3006a, here in the District of Columbia.

Please be advised that under no circumstance may I be at liberty to construe that administrative redress in good faith on your part is underway without at the very least the latter three questions being answered.



Sincerely,

_____, _____

Radcliffe B. Lewis.

Cc: Chief Judge Annice M. Wagner, Chair, Joint Committee on Judicial Administration
Mr. Herb Robinson, Chief of Staff – CJA Office
Federal Trade Commission

_____ R _____



**Radcliffe Lewis <intellexae@gmail.com>**

# us dol on ech
1 message

---

**Radcliffe Lewis <intellexae@gmail.com>**                                    **Wed, Apr 30, 2008 at 3:12**
To: intellexae@gmail.com

us dol's involvement with forwarding the ECH plan

---



U.S. Department of Labor
Office of Disability Employment Policy



www.dol.gov/odep                                                      Search / A to Z Index

---

April 30, 2008    DOL Home > ODEP > Ending Chronic Homelessness Through Employment and Housing
## Ending Chronic Homelessness Through Employment and Housing; Notice

[Federal Register: July 18, 2003 (Volume 68, Number 138)]
[Notices]
[Page 42817-42872]
From the Federal Register Online via GPO Access [wais.access.gpo.gov]
[DOCID:fr18jy03-190]

[[Page 42817]]

-----------------------------------------------------------------------

Part II

Department of Labor

-----------------------------------------------------------------------

Department of Housing and Urban Development

-----------------------------------------------------------------------

Ending Chronic Homelessness Through Employment and Housing; Notice

[[Page 42818]]
-----------------------------------------------------------------------

DEPARTMENT OF LABOR

DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

[SGA 03-15]

Ending Chronic Homelessness Through Employment and Housing

Program components, Permanent Housing for Persons with Disabilities and Safe Havens, as well as the Shelter Plus Care Program are described below:

Supportive Housing Program

1. Permanent Housing for Persons with Disabilities. Permanent Housing projects provide long-term housing and supportive services (provided with other non-SHP funds) that are designed to enable chronically homeless persons with disabilities to live as independently as possible. Permanent housing can be provided at one site or in scattered sites. Further, Permanent Housing may be tenant-based, meaning that the tenant can choose the housing. This approach focuses on identification and engagement through assertive outreach to individuals, immediate placement in permanent housing, and availability of appropriate supportive services.

2. Safe Havens (that have the characteristics of a Permanent Housing Project, i.e., have a lease agreement with the client). Safe Havens are projects targeted to hard-to-reach homeless persons who have severe mental illness and are on the streets. The goal of a Safe Haven is to serve as a small, highly supportive environment where an individual can feel at ease, out of danger, and subject to limited service demands. Tenants can move directly into housing with few explicit services required. It is hoped that after a period of stabilization in a Safe Haven, residents will be more willing to participate in services and referrals and will eventually be ready to move to more traditional forms of housing. Safe Havens may serve as an entry point to the service system and provide access to basic services such as good food, clothing, bathing facilities, telephones, storage space, and a mailing address. The specific criteria that must be exhibited by a Safe Haven are:

[sbull] A lease agreement with the client,
[sbull] No limit on length of stay,
[sbull] Provision of 24-hour residence,
[sbull] Provision of private or semiprivate accommodations,
[sbull] Overnight occupancy limited to 25 persons.

Shelter Plus Care Program

The Shelter Plus Care Program (either tenant-, sponsor-, or project-based without rehabilitation) gives applicants flexibility in devising appropriate housing and supportive services for homeless persons with disabilities through rental assistance. Assisted units may be of any type, from group homes to apartments. Participants in S+C units receive supportive services and rental assistance provided through the S+C program must be matched in the aggregate on a dollar for dollar basis by the recipient with supportive services.

Part V. Eligible Applicants and Required Partnerships

DOL Eligible Applicants: For the DOL Cooperative Agreement awards, eligible applicants are Local Workforce Investment Boards (Local Boards), or, if appropriate, the WIA grant recipient or fiscal agent for the local area on behalf of the Local Board under the Workforce Investment Act. Eligible applicants must be able to document that their locality has at least 150 persons who are chronically homeless. In order to be determined eligible, the Local Board must enter into partnerships with organizations serving people who are chronically homeless, consistent with the proposed activities of this Cooperative Agreement. To be determined eligible, applicants may not utilize certificates authorized under Section 14(c) of the Fair Labor Standards Act in their implementation of project activities and must utilize only individually determined customized employment strategies in securing employment for the target population.

HUD Eligible Applicants: Eligible applicants for the HUD grant within this initiative are described in the HUD Eligible Applicants and Activities Chart. See Part VII, Section III, Part A. Applicants must be a part of their local Continuum of Care and must certify to this relationship. Eligible applicants must be able to document that their locality has at least 150 persons who are chronically homeless. In order to be determined eligible, the HUD eligible applicant must enter into a partnership with their Local Workforce Investment Board, as described above, who is making an application for the DOL Cooperative Agreement being offered within this Solicitation.

DOL and HUD Required Partnerships: The purpose of the **Ending** Chronically **Homelessness** through Employment and Housing Cooperative Agreements is to demonstrate the employment potential of persons who are chronically homeless through techniques designed to accomplish community employment in non-stereotypical integrated settings, utilizing ``customized employment'' strategies. These efforts must include the involvement of many key partners,

especially those providing housing services to persons who are chronically homeless as well as those providing or capable of providing customized employment services to persons with disabilities. Applicants must demonstrate that subcontractors will provide the necessary supportive services to address the needs of the chronically homeless including

[[Page 42823]]

coordinating and integrating the project with other mainstream health and social services for which homeless populations may be eligible. In order to ensure a coordination of effort between these two awards, proposals shall demonstrate that a strong partnership commitment has been made between the two respective eligible applicants (for the DOL Cooperative Agreement award and for the HUD permanent housing grant). While these two awards (DOL Cooperative Agreement and HUD grant), are from separate funding sources, their potential can only be realized through this coordination of effort. Failure to clearly document, through a Memorandum of Agreement, this coordination of effort will yield a proposal ``non-responsive'' and disqualified from any further consideration.

In addition, the DOL Cooperative Agreement applicant must submit a letter signed by their state's governor, or his or her designee, for overall implementation of the Olmstead decision, that the proposed Cooperative Agreement activities will be regarded as a demonstration program playing a role in the state's employment implementation effort(s) under the Olmstead decision. Moreover, this letter should describe how the lessons learned under this Cooperative Agreement will be utilized to benefit other communities throughout the state, and thereby provide expanded customized community employment options for other homeless people with disabilities who are covered under the Olmstead decision and Executive Order.

Part VI. Format Requirements for Cooperative Agreement and Grant Application

General Requirements: All applications will be submitted to DOL. There are separate application requirements for the DOL Cooperative Agreement and the HUD grant, however, the Executive Summary--Project Synopsis and Part VII, Section 2 (Collaboration Requirements) will provide an opportunity to explain the applicants' collaborative program design. Applicants must submit one (1) paper copy with an original signature, and two (2) additional paper copies of the signed proposal. To aid with the review of applications, DOL also encourages applicants to submit an electronic copy of their proposal on disc or CD using Microsoft Word. Applicants who do not provide an electronic copy will not be penalized. The Application must be double-spaced with standard one-inch margins (top, bottom, and sides) on 8 \1/2\ x 11 papers, and be presented on single-sided, and numbered pages. A font size of at least twelve (12) pitch is required throughout. Applications that fail to meet these requirements will be considered non-responsive. DOL Cooperative Agreement Requirements:

The three required sections of the application are:

Section I--Project Financial Plan
Section II--Executive Summary--Project Synopsis
Section III--Project Narrative (including Attachments, not to exceed fifty (50) pages)

Mandatory requirements for each section are provided as follows in this application package. Applications that fail to meet the stated mandatory requirements of each section will be considered non- responsive.

Mandatory Application Requirements

[sbull] Section I. Project Financial Plan (Budget)--[The Project Financial Plan will not count against the application page limits.]

Section I of the application must include the following three required parts:

(1) Completed ``SF 424--Application for Federal Assistance.''

(See Appendix A of this SGA for required form)

(2) Completed SF 424 A--Budget Information Form by line item for all costs required to implement the project design effectively.

## TABLE 1
## HOMELESS-VANT SERVICES AVAILABLE IN HHS ASSISTANCE PROGRAMS[a]

| HHS Mainstream Assistance Programs / Services Provided—[a] | CORE SERVICES | | | | | | | | | | | | SUPPORTIVE SERVICES | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Out-reach | Primary Health Care | Alcohol & Drug Abuse Services | Mental Health & Counseling Services | Inpatient Services | Supportive Case Mgt | Intensive/ ACT Case Mgt | I & R | Income Mgmt & Support | Residential Treatment | Discharge Planning | No. of Core Services Offered | Life Skills | Child Care | Education & Training | Employment Services | Legal | Transportation | No. of Supportive Services Offered |
| Community Mental Health Services Block Grant (CMHSBG) | ● | ● | ● | ● | | ● | ● | ● | ● | ● | ● | 10 | ● | ● | ● | ● | ● | ● | 6 |
| Community Services Block Grant (CSBG) | ● | | | | | ● | | ● | ● | | | 4 | ● | ● | ● | ● | ● | ● | 5 |
| Consolidated Community Health Centers (CHCs) | ●[b] | ● | ●[b] | ●[d] | | ●[b] | | ● | | ●[b] | | 4 | | | ●[g] | | | ● | 2 |
| Medicaid[a] | ●[l] | ●[m] | ●[n] | ●[o] | ● | ●[p] | ●[q] | ●[r] | ●[c] | ●[s] | ●[r] | 9 | ●[t] | ● | | ●[u] | | ●[v] | 3 |
| Ryan White Act | ● | ● | ● | ● | | ● | ● | ● | | | ● | 8 | ● | ● | ● | ● | ● | ● | 6 |
| Social Service Block Grant (SSBG) | ● | ● | ● | ● | | ● | ● | ● | ● | ● | ● | 10 | ● | ● | ● | ● | ● | ● | 6 |
| Substance Abuse Prevention & Treatment Block Grant | ● | | | | ● | ● | ● | ● | | ● | ● | 7 | | ● | | ● | | ● | 3 |
| Temporary Assistance for Needy Families (TANF) | ●[w] | | ●[x] | ●[x] | | ●[w] | ●[w] | ●[w] | ● | ●[w] | ●[w] | 10 | ●[w] | ●[w] | ●[w] | ●[w] | ●[w] | ●[w] | 6 |
| **No. of Programs Offering Service** | 7 | 6 | 7 | 5 | 1 | 7 | 6 | 8 | 4 | 5 | 6 | | 6 | 6 | 6 | 6 | 5 | 8 | |

[a] Services provided refers to those that are required, eligible or covered in each program.
[b] A supplemental service available to some but not all centers.
[c] In-home services not a requirement of the program.
[d] Mental health service include services of a psychiatrist, psychologist, & other appropriate mental health professionals. These services are supplemental; most centers do not have extensive mental health services.
[e] Through referrals to other providers.
[f] Patients are followed in the hospital either directly with privileges or through appropriate referral mechanisms.
[g] Limited to health education.
[h] Outreach, as needed for adequate patient care. Residents of catchment area served by the Center with special difficulties of access to services provided by the Center may receive such services.
[i] Transportation, as needed for adequate patient care.
[j] Outreach & engagement are required in Head Start, but are not specific to homeless persons.
[k] Not used.
[l] All provided Medicaid services are State administered and limited in amount, duration, and scope.
[m] As administrative expense (50 percent match).

[m] Physician, outpatient hospital, home health for persons eligible for nursing facility services, rural health clinic services, lab & x-ray, FQHC services.  Eligible/covered include clinic, optometrist/eyeglasses, prescribed drugs, prosthetic devices, dental.

[n] Eligibility requires meeting categorical requirements other than substance abuse.

[o] If physician service or in-patient hospital.  Eligible/covered: prescription drugs & additional services under a waiver program.

[p] State option

[q] Service may be created using State plan option(s).

[r] May be part of case management services or service provided by managed care organizations.

[s] If inpatient hospital, nursing facility, intermediate care facility for mental retardation, or psychiatric residential treatment facility for persons under 21 years of age.

[t] Particularly under a waiver program.

[u] Specialized therapies only (e.g., occupational, speech, & physical).

[v] May be covered to receive medical care as program or administrative costs by a state.

[w] State option, but families are the clients, not individuals.

[x] Service must be non-medical in nature.

# Chapter 5

## A Formal Statement of the HHS
## Comprehensive Plan to End Chronic Homelessness[1]

**Mission:** To end chronic homelessness in a decade.

**Goals:**

> **Goal 1.**
> *Improve access to treatments and supports*

> Objective:
> Expand the capacity of HHS programs to assist persons experiencing chronic homelessness.

> Strategies that Help Homeless People

➤ Develop approaches in relevant programs to strengthen outreach and engagement activities that will facilitate enrollment in treatment and service programs of individuals who are chronically homeless.

> **Examples:**
> *a) Encourage mainstream programs that support outreach and case management to identify chronically homeless persons as potentially eligible candidates for these services. Where appropriate, pursue new funding to expand services such as increased outreach, increased case management/enrollment assistance, or ombudsman programs for homeless persons that will advocate for service access.*
>
> *b) Investigate approaches that expedite eligibility processes (such as reducing or simplifying documentation requirements, and/or use out-stationing where applicable) or advances in technology and communications that expedite the exchange and processing of information, including rural areas or where providers are distant from clinic sites and Disability Determination Offices.*

➤ Implement approaches in relevant programs that facilitate prompt eligibility review for persons identified as chronically homeless or at risk of becoming chronically homeless.

---

1. It is assumed throughout this document that no strategies will be implemented without seeking and attaining all relevant legislative and/or regulatory changes needed to ensure that all programs within HHS continue to operate within their given authority and mission. It is also assumed that, to the extent the strategies seek to impose any requirements on applicants as conditions of given awards, before doing so, programs will confirm that their authorizing authority and program/administrative regulations permit such imposition of conditions. It is further assumed that no proposals will be implemented without resolving any inherent budget implications.

# NEIGHBORHOOD
# PROFILES



Washington, DC
Economic Partnership

| Population | 0–0.5 mi | 0–1 mi | 0–3 mi |
| --- | --- | --- | --- |
| Population | 9,096 | 13,237 | 231,213 |
| Male (%) | 46.7 | 47.6 | 49.5 |
| Female (%) | 53.3 | 52.4 | 50.5 |

| Households | | | |
| --- | --- | --- | --- |
| Households | 5,526 | 7,706 | 109,621 |
| Average Household Size | 1.6 | 1.7 | 2.0 |
| Owner-occupied (%) | 41.3 | 37.6 | 34.4 |

| Income | | | |
| --- | --- | --- | --- |
| Average Household | $61,640 | $66,935 | $75,656 |
| Median Household | $49,717 | $50,835 | $49,540 |
| Median HH Disposable | $37,449 | $38,006 | $37,791 |
| Median Net Worth | $102,305 | $102,906 | $80,914 |

| Consumer Expenditures ($000) | | | |
| --- | --- | --- | --- |
| Apparel | $12,271 | $18,807 | $311,934 |
| Computers & Accessories | $1,183 | $1,828 | $30,096 |
| Entertainment & Recreation | $15,293 | $23,226 | $372,798 |
| Pets | $1,856 | $2,801 | $44,589 |
| Television, Radio & Sound | $5,639 | $8,521 | $138,319 |
| Food at Home | $24,109 | $36,249 | $588,961 |
| Home Improvement | $9,405 | $14,220 | $218,175 |
| Household Furnishings | $9,691 | $14,748 | $236,086 |
| Meals at Restaurants | $15,232 | $23,176 | $379,738 |
| Personal Care | $2,274 | $3,443 | $55,923 |
| Vehicle Maint. & Repair | $4,892 | $7,401 | $118,581 |
| Average Spent per HH | $21.4 | $23.1 | $26.1 |

| Age (%) | | | |
| --- | --- | --- | --- |
| Age 0–4 | 3.6 | 3.9 | 5.2 |
| Age 5–9 | 3.6 | 3.6 | 4.8 |
| Age 10–14 | 4.3 | 4.4 | 5.3 |
| Age 15–24 | 9.7 | 9.9 | 14.0 |
| Age 25–34 | 14.5 | 17.3 | 21.1 |
| Age 35–44 | 12.4 | 13.6 | 15.7 |
| Age 45–54 | 15.9 | 15.6 | 13.0 |
| Age 55–64 | 16.1 | 15.1 | 10.4 |
| Age 65+ | 20.0 | 16.6 | 10.4 |
| Median Age (years) | 46.4 | 43.0 | 34.8 |

* Source: ESRI, 2007 Estimates & Projections
Data gathered from 6th Street & Maine Avenue



0.5 mile radius*

Southwest Waterfront

| METRORAIL COUNTS (weekday | weekend) | TRAFFIC COUNTS (weekday) |
| --- | --- |
| 41,958 \| 16,307  5,961 \| 6,898 | 24,200–28,000 |
| L'Enfant Plaza; Waterfront/SEU | Maine Avenue |



## CONTACT

**Washington, DC Economic Partnership**
Keith Sellars
*Senior Vice President, Development & Retail*
p| 202.661.8684
e| ksellars@wdcep.com
w| www.wdcep.com


Washington, DC
Economic Partnership

The Washington, DC Economic Partnership is a 501(c)(3) public/private partnership dedicated to facilitating economic
development in the District of Columbia by promoting business opportunities and retail attraction activities.

Public Sector
PARTNER



support services, substantial and permanent reductions in the occurrence of chronic homelessness are achievable.

## What Characteristics Are Associated with Chronic Homelessness?

While chronic homelessness may be identifiable by a pattern of homeless duration, other facts associated with this subgroup add to our understanding.

1) *Disability*: The presence of a disabling condition is almost universal in the population. These conditions involve serious health conditions, substance abuse, and psychiatric illnesses. The prevalence of a disabling condition runs as high as 85 percent having one of more of these chronic problems. In contrast, data from mid-1990's indicate approximately 12 percent of working-age persons have a moderate to severe disability. Disability is a highly relevant factor where services are concerned since certain kinds of disability are an eligibility portal for many HHS assistance programs.

2) *Heavy Use of Services:* Persons experiencing chronic homelessness are heavy users of the homeless assistance system and of other health and social services. Although they constitute 10 percent of the users of homeless shelter assistance, they consume fully 50 percent of the days of shelter provided by that system.

   In addition, analyses in New York City indicate that use of expensive emergency room visits, uncompensated care, and involvement with the criminal justice system among the chronically homeless represent significant costs to local, State, and Federal programs. The analysis tracked the service costs attributable to a cohort of chronically homeless persons before and after their placement in permanent supportive housing. The following New York data were provided at the July 18, 2002 meeting of the U.S. Interagency Council on Homelessness and show the changes in annual health care costs for the 2 years after a person was placed in housing compared to the annual costs incurred for the 2 years preceding housing placement. For health care, the data clearly show placement in supportive housing is associated with overall reductions in health care costs.

   | | |
   |---|---|
   | Psychiatric hospital | $8,260 |
   | Municipal hospital | 1,771 |
   | Medicaid–Inpatient | 3,787 |
   | Medicaid–Outpatient | 2,657 |
   | Annual savings (per person) | $11,161 |

3) *Engagement with Treatments:* More than a decade of research has shown that persons experiencing chronic homelessness frequently exhibit a pattern of being disconnected from conventional community life. Many have limited support systems, reflected in most being single adults with weak family connections. Many are from ethnic and racial minorities and research also shows they may be reluctant to interact

   with systems they do not understand or which do not understand them. Many have past experiences with mainstream services that did not effectively address their needs or prevent them from falling into homelessness. These characteristics contribute to the

Jurisdictions." <u>Public Health Reports</u> 2001; 116: 344-352.



THE NEEDS OF A CHRONICALLY HOMELESS PERSON CROSS
MANY SERVICE SYSTEM BOUNDARIES.

long or repetitive patterns of homelessness they exhibit. They also reflect why re-engaging a chronically homeless person with treatments can be challenging.

4) *Multiple Problems:* Chronically homeless individuals fall within the subset of persons who present a complex set of multi-problem challenges to service providers. Like frail elders with complex medical conditions, HIV patients with psychiatric and substance abuse issues, or a TANF client with domestic violence or counseling needs, the service needs of chronically homeless people outstrip the in-house competencies of most providers.

In addition to the issues noted above, extreme poverty, poor job skills, lack of education, and negative childhood experiences are common features of chronic homelessness. The figure above, first used in the briefing material to the Work Group, describes the array of complex service needs associated with chronic homelessness.

5) *Fragmented Systems:* Both practice and research have shown that the chronically homeless person is most likely to face a service system that is fragmented and providers who are not able to summon the flexible or comprehensive set of treatments and services the person needs. For providers to be effective with such individuals, they must either become uniquely specialized or piece together an informal system of referrals and service collaborations with other providers to ensure access to at least some of the needed services. The homeless shelter system, in dealing with daily demands that routinely exceed capacity, typically is not able to reshape itself along either of these tracks. Without services that address the multi-problem nature of long

# NOTICE

## Rule: LCvR 5.4 (F)

This Exhibit #7 Contains

DD Form 2366    Military/Naval Entrance

DD Form 214    Honorable Discharge

Form N-550    Certificate of Naturalization

Form FR-500 pg1    DC Business Registrat

C155

## VETERANS' EDUCATIONAL ASSISTANCE ACT OF 1984 (NEW GI BILL)
### (Chapter 30, Title 38, U.S. Code)

**Privacy Act Statement**

**AUTHORITY:** Chapter 30, Title 38, US Code, Sections 1411 and 1412; and EO 9397, November 1943 (SSN).

**PRINCIPAL PURPOSE:** To establish eligibility to participate in the Veterans Educational Assistance Act of 1984 (New GI Bill.)

**ROUTINE USES:** Information will be used as a source document indicating participation status of each service member in the New GI Bill Educational Benefits Program.

**DISCLOSURE:** Disclosure of your social security number and other personal information is voluntary. However, this form CANNOT be processed if requested information is not provided.

**1. SERVICE MEMBER**

| a. NAME (Last, First, Middle Initial) | b. SOCIAL SECURITY NUMBER (SSN) |
|---|---|
| LEWIS RADCLIFFE B | 213174028 |

**2. STATEMENT OF UNDERSTANDING**

a. I am eligible for the New GI Bill based on my entry on active duty on or after July 1, 1985.

b. I understand that I am automatically enrolled and that I have the option to disenroll. (See paragraph 3 or 4)

c. If I disenroll, I must do so on the date designated by my service.

d. I am a Service academy or ROTC scholarship graduate and I am NOT ELIGIBLE for the New GI Bill. (Strike if applicable)

e. I understand that if I enrolled in the New GI Bill, my basic pay will be reduced $100 per month for EACH of the first full 12 months of active duty and CANNOT BE REFUNDED, SUSPENDED OR STOPPED.

f. I must complete three years of active duty service before I am entitled to $300 per month for 36 months.

g. If I have a two year obligation, I understand that I must complete two years of active duty to receive $250 per month for 36 months.

h. I must complete two years of active duty service and join the Selected Reserve for a minimum four year service agreement before I am entitled to $300 per month for 36 months.

i. If a non-high school graduate, I must complete all requirements for a high school diploma (or an equivalency certificate) before completion of my initial tour in order to qualify for the New GI Bill.

j. I must use my benefits within 10 years of my separation or discharge from active duty for the entitlement in paragraph 2 g., or complete my Selected Reserve obligation for the entitlement in paragraph 2.h.

k. I must receive an honorable discharge for service which established entitlement to the New GI Bill.

**l. SERVICE MEMBER**

| (1) TYPED OR PRINTED NAME (Last, First, Middle Initial) | (2) RANK/GRADE | (3) SIGNATURE | (4) DATE SIGNED |
|---|---|---|---|
| LEWIS RADCLIFFE B | E1 | *Radcliffe, Bancroft Lewis* | 30 JUL 90 |

**m. WITNESSING OFFICIAL**

| (1) TYPED OR PRINTED NAME (Last, First, Middle Initial) | (2) RANK/GRADE | (3) SIGNATURE | (4) DATE SIGNED |
|---|---|---|---|
| HOLMES, D.V. | E4 | *David V. Holmes* | 30 JUL 90 |

**3. STATEMENT OF ENROLLMENT**

I am enrolling in the "New GI Bill" and ACCEPT THE TERMS OF 2.a. through k.

**a. SERVICE MEMBER**

| (1) TYPED OR PRINTED NAME (Last, First, Middle Initial) | (2) RANK/GRADE | (3) SIGNATURE | (4) DATE SIGNED |
|---|---|---|---|
| LEWIS RADCLIFFE B | E1 | *Radcliffe Bancroft Lewis* | 30 JUL 90 |

**b. WITNESSING OFFICIAL**

| (1) TYPED OR PRINTED NAME (Last, First, Middle Initial) | (2) RANK/GRADE | (3) SIGNATURE | (4) DATE SIGNED |
|---|---|---|---|
| HOLMES, D.V. | E4 | *David V. Holmes* | 30 JUL 90 |

**4. STATEMENT OF DISENROLLMENT**

I do not desire to participate in the New GI Bill. I understand that I WILL NOT be able to enroll at a later date.

**a. SERVICE MEMBER**

| (1) TYPED OR PRINTED NAME (Last, First, Middle Initial) | (2) RANK/GRADE | (3) SIGNATURE | (4) DATE SIGNED |
|---|---|---|---|
| | | | |

**b. WITNESSING OFFICIAL**

| (1) TYPED OR PRINTED NAME (Last, First, Middle Initial) | (2) RANK/GRADE | (3) SIGNATURE | (4) DATE SIGNED |
|---|---|---|---|
| | | | |

**5. SERVICE UNIQUE EDUCATION ASSISTANCE OPTIONS**

If I enroll in the New GI Bill, I may be eligible for additional educational assistance based on my military specialty and/or years of service as shown below.

DD Form 2366, MAR 87
S/N 0102-LF-002-3661

*Previous editions are obsolete*

OFFICIAL RECORD COPY

CAUTION: NOT TO BE USED FOR
IDENTIFICATION PURPOSES

THIS IS AN IMPORTANT RECORD.
SAFEGUARD IT.

ANY ALTERATIONS IN SHADED
AREAS RENDER FORM VOID

## CERTIFICATE OF RELEASE OR DISCHARGE FROM ACTIVE DUTY

| 1. NAME (Last, First, Middle) | 2. DEPARTMENT, COMPONENT AND BRANCH | 3. SOCIAL SECURITY NO. |
|---|---|---|
| LEWIS, RADCLIFFE BANCROFT | NAVY - USNR | 213 | 171 | 4028 |

| 4.a. GRADE, RATE OR RANK | 4.b. PAY GRADE | 5. DATE OF BIRTH (YYMMDD) | 6. RESERVE OBLIG. TERM. DATE |
|---|---|---|---|
| | E3 | 690322 | Year on | Month 0704 | on |

| 7.a. PLACE OF ENTRY INTO ACTIVE DUTY | 7.b. HOME OF RECORD AT TIME OF ENTRY (City and state, or complete address if known) |
|---|---|
| SILVER SPRING, MD | 14402 TAOS CT SILVER SPRING, MD 20906-0000 |

| 8.a. LAST DUTY ASSIGNMENT AND MAJOR COMMAND | 8.b. STATION WHERE SEPARATED |
|---|---|
| USS RANGER (CV 61) | USS RANGER (CV 61) AT LONG BEACH CA |

| 9. COMMAND TO WHICH TRANSFERRED | 10. SGLI COVERAGE | None |
|---|---|---|
| NAVAL RESERVE PERSONNEL CENTER NEW ORLEANS, LA 70149 | Amount: $ 100,000.00 | |

| 11. PRIMARY SPECIALTY (List number, title and years and months in specialty. List additional specialty numbers and titles involving periods of one or more years.) | 12. RECORD OF SERVICE | Year(s) | Month(s) | Day(s) |
|---|---|---|---|---|
| NCW2 | a. Date Entered AD This Period | 90 | JUL | 24 |
| | b. Separation Date This Period | 93 | AUG | 31 |
| | c. Net Active Service This Period | 03 | 00 | 38 |
| | d. Total Prior Active Service | 00 | 00 | 00 |
| | e. Total Prior Inactive Service | 00 | 00 | 14 |
| | f. Foreign Service | 00 | 00 | 00 |
| | g. Sea Service | 02 | 09 | 24 |
| | h. Effective Date of Pay Grade | 91 | 00 | 00 |

| 13. DECORATIONS, MEDALS, BADGES, CITATIONS AND CAMPAIGN RIBBONS AWARDED OR AUTHORIZED (All periods of service) |
|---|
| SEA SERVICE DEPLOYMENT RIBBON (2 AWARDS), BATTLE "E" (2 AWARDS), NATIONAL DEFENSE SERVICE MEDAL, KUWAIT LIBERATION MEDAL, SOUTHWEST ASIA SERVICE MEDAL W/ 3 BRONZE STARS, NAVY UNIT COMMENDATION, ARMED FORCES EXPEDITIONARY MEDAL, JOINT MERITORIOUS UNIT AWARD |

| 14. MILITARY EDUCATION (Course title, number of weeks, and month and year completed) |
|---|
| NONE |

| 15.a. MEMBER CONTRIBUTED TO POST-VIETNAM ERA VETERANS' EDUCATIONAL ASSISTANCE PROGRAM | YES | NO | 15.b. HIGH SCHOOL GRADUATE OR EQUIVALENT | YES | NO | 16. DAYS ACCRUED LEAVE PAID |
|---|---|---|---|---|---|---|
| | | X | | X | | 9.5 |

| 17. MEMBER WAS PROVIDED COMPLETE DENTAL EXAMINATION AND ALL APPROPRIATE DENTAL SERVICES AND TREATMENT WITHIN 90 DAYS PRIOR TO SEPARATION | X YES | NO |
|---|---|---|

| 18. REMARKS |
|---|
| DENTAL EXAMINATION COMPLETED, 93AUG11. FURTHER TREATMENT IS NOT REQUIRED. MEMBER IS NOT ELIGIBLE FOR VA DENTAL OUTPATIENT TREATMENT. DISTRIBUTION OF DD FORM 214 IAW NAVMILPERSCOMINST 1900.1B. DATE MEMBER DETACHED SEPARATION ACTIVITY: 93AUG13. AUTHORIZED 8 DAYS TRAVEL TIME. MEMBER PASSED AT13 NAVY WIDE ADVANCEMENT EXAM, CYCLE 139 OF MAR93. |

| 19.a. MAILING ADDRESS AFTER SEPARATION (Include Zip Code) | 19.b. NEAREST RELATIVE (Name and address - Include Zip Code) |
|---|---|
| 2405 ARCOLA AVE SILVER SPRING, MD 20902 | BARBARA J. LEWIS (MOTHER) 2405 ARCOLA AVE SILVER SPRING, MD 20902 |

| 20. MEMBER REQUESTS COPY 6 BE SENT TO DIR. OF VET AFFAIRS | YES | NO | 22. OFFICIAL AUTHORIZED TO SIGN (Typed name, grade, title and signature) |
|---|---|---|---|
| 21. SIGNATURE OF MEMBER BEING SEPARATED | | | E G CARDENAS, PRC(SW), USN ADMIN OFF, EX USS RANGER |

| SPECIAL ADDITIONAL INFORMATION (For use by authorized agencies only) |
|---|

| 23. TYPE OF SEPARATION | 24. CHARACTER OF SERVICE (Include upgrades) |
|---|---|
| RELEASE FROM ACTIVE DUTY | HONORABLE |

| 25. SEPARATION AUTHORITY | 26. SEPARATION CODE | 27. REENTRY CODE |
|---|---|---|
| MILPERSMAN 3620150.1C | MBK | RE-1 |

| 28. NARRATIVE REASON FOR SEPARATION |
|---|
| HELD EXPIRATION OF TERM OF ACTIVE OBLIGATED SERVICE |

FORM N-550 REV. 6-91

# UNITED STATES OF AMERICA

## CERTIFICATE OF NATURALIZATION

No. 21632861





Personal description of holder as of date of naturalization:

Date of birth: ...

Sex: MALE

Height: 5 feet 11 inches

Marital status: SINGLE

Country of former nationality: JAMAICA

INS Registration No. A90 563 336

I certify that the description given is true, and that the photograph affixed hereto is a likeness of me.

_____
(Complete and true signature of holder)

Be it known that, pursuant to an application filed with the Attorney General

at: BALTIMORE, MARYLAND

The Attorney General having found that:

RADCLIFFE BANCROFT LEWIS

then residing in the United States, intended to reside in the United States when so required by the Naturalization Laws of the United States, and had in all other respects complied with the applicable provisions of such naturalization laws and was entitled to be admitted to citizenship, such person having taken the oath of allegiance in a ceremony conducted by the

UNITED STATES IMMIGRATION AND NATURALIZATION SERVICE

at: BALTIMORE, MARYLAND    on: SEP 15 1995

that such person is admitted as a citizen of the United States of America.

Commissioner of Immigration and Naturalization

IT IS PUNISHABLE BY U.S. LAW TO COPY, PRINT OR PHOTOGRAPH THIS CERTIFICATE, WITHOUT LAWFUL AUTHORITY.

| **FR-500** | COMBINED BUSINESS TAX REGISTRATION APPLICATION |  ★ ★ ★ | GOVERNMENT OF THE DISTRICT OF COLUMBIA OFFICE OF TAX AND REVENUE |

## PART I – GENERAL INFORMATION

1(a). Federal Employer Identification Number 200815900

1(b). Social Security Number

2. NAIC Business Code 541190

3. Reason for application: (please check)
- ☒ New business
- ☐ Additional location
- ☐ Purchased existing business
- ☐ Name change
- ☐ Legal form change
- ☐ Other

_____

- ☐ Employment of household/domestic help
- ☐ Address change
- ☐ Merger
- ☐ Street vendor
- ☐ Heating oil company
- ☐ Utility company

4. Legal form of business: (please check)
- ☒ Sole proprietor
- ☐ Limited Liability Company
- ☐ General partnership
- ☐ Limited liability partnership
- ☐ Corporation

If incorporated, enter state and date of Incorporation

State _____ Date _____

- ☐ Limited partnership
- ☐ Government
- ☐ Joint venture
- ☐ Other

_____

5. Business Name (Individual, Partnership, Corporation)

Radcliffe Research & Investigations

6. Trade Name (if different from Line 5)

7. Business Address (P.O. Box not acceptable unless located in a Rural Area)
C/o Radcliffe B. Lewis 19 Eye Street, NW        Washington DC 20001

8. Mailing Address
C/o Radcliffe B. Lewis 19 Eye Street, NW        Washington DC 20001

9. Local Business Phone No.   10. Main Office Phone No.   10(a). FAX No.        11. Date present business commenced in D.C. or date expected to begin

(202) 842-1112                                          05/01/2004

12. If previously registered with the District of Columbia, please indicate:

Former Entity Name _____ Business Tax Registration Number _____

Former Trade Name _____ Name of Former Owners _____

13. NAME, TITLE, HOME ADDRESS, SOCIAL SECURITY NUMBER OF PROPRIETOR, PARTNERS OR PRINCIPAL OFFICERS

| Name and Title | Home Address | Social Security Number |
|---|---|---|
| Radcliffe Lewis OWNER | 19 Eye Street, NW<br>Washington DC 20001 | 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 |
| Name and Title | Home Address | Social Security Number |
| Name and Title | Home Address | Social Security Number |